## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| FTE NETWORKS, INC. | : |
| Plaintiff, | : |
| v. | : Civ. A. No.: |
| ALEXANDER SZKARADEK; AND ANTONI SZKARADEK; | : |
| Defendants. | : |

## COMPLAINT

Plaintiff FTE Networks, Inc., by and through its undersigned counsel, hereby alleges as against Defendants Alexander Szkaradek, and Antoni Szkaradek:

## NATURE OF THE ACTION

1.      In or around February 2019, FTE was hit with the bombshell that its former CEO, Michael Palleschi, and its former CFO, David Lethem had orchestrated a fraudulent scheme to hide the deteriorating financial condition of the company, and to embezzle millions of dollars to pay for private jet use, luxury automobiles, personal credit cards, unauthorized wire transfers, stock issuances and unauthorized salary increases.[1]

2.      Alexander and Antoni Szkaradek (the "Szkaradeks") had their own troubles.

3.      On October 10, 2019, the Commonwealth of Pennsylvania filed a Complaint against the Szkaradeks, Vision Property Management, LLC ("Vision") and a series of other Szkaradek related companies that were accused of luring consumers into entering "rent-to-own" agreements on poorly maintained, foreclosed houses.  Among other fraudulent practices, the Commonwealth alleged that the Szkaradeks and their companies failed to disclose that these

---

[1] Both former officers were ultimately charged by state and federal prosecutors with numerous felonies on July 15, 2021.  *See https://www.cnbc.com/2021/07/15/fte-networks-executives-charged-with-securities-fraud-conspiracy.html; https://www.sec.gov/litigation/complaints/2021/comp-pr2021-127.pdf*

agreements provided no ownership rights to consumers unless they exercised an overpriced option, and that consumers faced immediate eviction if they fell behind on payments. The Commonwealth further alleged that certain provisions in Vision's agreements making consumers responsible for expensive repairs required to make the homes safe to live in were unlawful.  It was further alleged that Vision utilized an "Agreement for Deed" and other contract formats that were unfair, deceptive and/or unlawful.

4.      In response to the Commonwealth's lawsuit and a swelling of similar consumer complaints across its portfolio of over 3,000 properties among 46 states, the Szkaradeks contemplated bankruptcy and met with their own bankruptcy counsel in mid-October 2019.

5.      Rather than file for bankruptcy (which could not shield them from the looming onslaught of state and consumer lawsuits due to their underlying fraud), the Szkaradeks instead conspired to unload their liabilities onto FTE, while simultaneously reaping millions of dollars for their own personal benefit.

6.      Target: FTE—a publicly traded company that: (i) was reeling from its own public fraud scandal, (ii) suffered from ballooning short-term and long-term debt obligations, and (iii) consisted of a newly seated board of directors and management team that was just getting its arms around their roles of righting a sinking ship stricken by fraud.

7.      The scheme was to pitch the portfolio of liability-laden properties onto FTE's new management and board members under the false premise that the properties were worth hundreds of millions of dollars and would allow FTE to recover from the damage caused by its former CEO and CFO.

8.      The Pitchman:  Suneet Singal, a habitual fraudster.

9.     Less than two weeks after Vision had been sued by the Commonwealth, Singal attended the first FTE board meeting of its newly appointed board on October 22, 2019.  At this board meeting, Singal introduced FTE to the Szkaradek portfolio and pitched a potential acquisition of the problematic Vision properties.  In making his pitch to FTE's new board, Singal represented that Vision's portfolio of properties had a then existing book value in excess of $350 million, and that with minimal rehabilitation, the properties would be worth in excess of $500 million.  As a further inducement to acquire the Vision portfolio and further garner support from FTE's new board members, Singal offered to retire millions of dollars of debt and promised to help facilitate a new fundraising channel through the exchange of FTE stock.

10.     On December 16, 2019, just days before the Vision portfolio was to close, FTE learned that the SEC had filed charges against Singal for a series of securities frauds against two public companies:

> This case is about two separate frauds Suneet Singal perpetrated that involved two public companies—a real estate investment trust ("FC REIT") and a business development company ("BDC")—between September 2015 and at least March 2018. In the fraud involving FC REIT, Singal purported to contribute 12 hotels that he did not own to close a business deal related to FC REIT that personally benefitted him. He then made numerous material misrepresentations in public SEC filings concerning FC REIT's ownership of the hotels. As part of the deal, Singal received consideration valued at more than $15 million for the hotels. Singal's sham contribution diluted the value of FC REIT's shares and resulted in FC REIT selling shares at inflated prices to unsuspecting investors.  With respect to the BDC, Singal engaged in a course of fraudulent conduct while he was a director and investment adviser to the BDC, and he owed a fiduciary duty to the BDC. As a fiduciary, Singal had a duty to act in the best interests of the BDC, to employ reasonable care to avoid misleading the BDC, and to not engage in self-dealing. Instead, and in breach of that duty, Singal lied about his conflicts of interest and misappropriated money that the BDC lent—as its largest investment—to a company he secretly controlled ("Company A").[2]

---

[2] *See* Ex. A, Securities and Exchange Commission Complaint against Suneet Singal, dated December 13, 2019.

11.     Despite these troubling charges by the SEC, the Szkaradeks remained resolute in closing on the Vision portfolio, representing to FTE and its board members that Singal was merely a broker and would not be involved in the transaction—or FTE's affairs—after its close.

12.     Nevertheless, the Szkaradeks insisted that Singal be compensated for his so-called finder's fee through the transfer of $100 million of FTE stock.  In pushing for this purported fee, the Szkaradeks promised that it would not be distributed to Singal, but rather, to the victims of Singal's SEC fraud, the shareholders of the First Capital Real Estate Trust, Inc. ("FC REIT").

13.     To be sure, on December 20, 2019, Singal issued his own press release announcing the acquisition of the Vision portfolio by FTE, and the concomitant pledge of $100 million in FTE shares to the victims of Singal's SEC Fraud—the shareholders of the FC REIT.[3]

14.     In duping FTE to continue with this transaction even in the face of his recent SEC charges, the Szkaradeks fraudulently concealed Singal's true participation and interest in the transaction by falsely representing that Singal was a mere broker and would have nothing to do with the transaction upon completion.  This representation was knowingly and intentionally false.

15.     To further this fraudulent concealment, the Szkaradek's conspired with Singal to include a representation and prohibition in the closing documents that no shares of FTE would be transferred to Singal, and that the 11,031,688  shares purportedly earned by Singal for his "broker fee" would never touch his hands, but instead would be transferred to the victims of Singal's prior SEC fraud—the shareholders of the FC REIT.  The representation was knowingly and intentionally false.

16.     To be sure, *to this day*, neither the Szkaradeks nor Singal has transferred the 11,031,688 shares of FTE stock to the FC REIT.

---

[3] https://apnews.com/press-release/pr-newswire/business-lifestyle-residential-real-estate-fte-networks-inc-af0f7f4e57a009a9faf934eff686282e

17.     Instead, Singal has used those 11,031,688 shares to further his ongoing conspiracy with the Szkaradeks and various board members of FTE to take over control of the company.  In addition to conspiring with the Szkaradeks to prevent the transfer of the 11,031,688 shares to the FC REIT, Singal also acquired additional shares of FTE through various other ruses and fraudulent transfers to companies he controls.

18.     On February 3, 2022, Singal and the Szkaradeks acted on their fraudulent scheme by attempting a coup to take over control of FTE through a purported amendment to its bylaws. *See* Ex. B.

19.     The fraud does not get more brazen.  Among other co-conspirators, the Bylaw Amendment was signed by the Szkaradeks, Singal himself, his wife Majque Ladnier, TTP 8, LLC (an entity owned or controlled by Singal and his wife), and Innovativ Media Group, Inc. (another company affiliated and acting in concert with Singal).

20.     Incredibly, Singal had also conspired with at least one former executive officer of FTE and one former and current members of FTE's board: Stephen Goodwin, Peter Ghishan, and Joseph Cunningham.

21.     That is not all.  Apparently, the depth of Singal's fraud knows no bounds.  On April 7, 2022, a federal grand jury indicted Singal for a series of wire and mail fraud committed by Singal in 2017 through his use of two other companies he claimed to own or control.  As alleged by the indictment, Singal stole over $800,000 from other purported investors in the receivables of those companies.  *See* Ex. C.

22.     Undeterred by the charges brought by the SEC and the United States Attorney, Singal continues his unlawful scheme against FTE by now conspiring with the Szkaradeks and other shareholders of FTE to overtake control of FTE.

23.    FTE now brings this action seeking a judgment and order: (i) permanently enjoining the Szkaradeks from transferring any common or preferred shares of FTE to Singal, his affiliates or family members; (ii) directing the Szkaradeks to transfer the 11,031,688 shares to the FC REIT; (iii) enjoining the Szkaradeks from exercising any rights of the 11,031,688 shares pledged to the FC REIT; (iv) directing the return all of the Szkaradeks FTE shares (including those possessed by Singal, his affiliates and co-conspirators) to FTE; and (v) awarding compensatory damages, punitive damages and attorney's fees.

## THE PARTIES

24.    Plaintiff FTE Networks, Inc. is a corporation duly organized under the laws of Nevada with its principal place of business located in New York, New York.

25.    Defendant Alexander Szkaradek is an individual resident and citizen of South Carolina.

26.    Defendant Antoni Szkaradek is an individual resident and citizen of South Carolina.

## JURISDICTION AND VENUE

27.    This Court has subject-matter jurisdiction over this action based upon 28 U.S.C. § 1332(a) because no Plaintiff is a citizen of the same state as Defendant and the amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

28.    This Court also has jurisdiction under 28 U.S.C. § 2201 *et. seq.*

29.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the parties agreed to jurisdiction and venue in this District by contract.

30.    Each Defendant is subject to the personal jurisdiction of this Court because each Defendant consented to the jurisdiction of this Court by contract.

## FACTS

A.      **General Background of Plaintiffs' Business and Financial Trouble**

31.      FTE Networks is a corporation duly organized under the laws of Nevada.  Prior to its relationship with the Szkaradeks, FTE primarily provided innovative, technology-oriented solutions for smart platforms, network infrastructures and buildings. The company provided end-to-end design, construction management, build and support solutions for state-of the art networks, data centers, residential, and commercial properties and services for Fortune 100/500 companies. After meeting Singal and the Szkaradeks, FTE sought to reposition itself as a real-estate company, owning and operating properties in the single-family residential market.

B.      **The Purchase Agreement with the Szkaradeks**

32.      In the wake of the embezzlement scandal involving its former CEO and CFO, FTE formed a new board of directors consisting of Michael Beys, Richard de Silva, Joseph Cunningham, and Peter Ghishan.

33.      Two of the directors, Cunningham and Ghishan, had close business ties with Singal, who was purporting to act as a financial advisor to the newly appointed FTE Board.  The other two directors, Beys and de Silva, were not aware of the full extent of those close business ties.

34.      During the first board meeting on October 22, 2019, Singal, acting in concert with the Szkaradeks, recommended to the board that it appoint Stephen M. Goodwin as the interim CEO of FTE.  Goodwin likewise had a close business relationship with Singal.  In all, Goodwin, Cunningham and Ghishan all had close business ties to Singal, the full extent of which were unknown to Beys and de Silva.

35.      The Board accepted and acted upon Singal's recommendation.

36.      As a result, Cunningham, Ghishan, and Goodwin effectively were Singal's secret operatives on the FTE board.

37.     During the same board meeting, Singal made numerous financial proposals to rehabilitate and reinvent FTE.  Specifically, Singal promised to help raise tens, if not hundreds, of millions of dollars for the company.

38.     As part of Singal's fundraising promises, one of the proposals was for Singal to purchase and retire several million dollars' worth of existing FTE debt at low conversion prices in exchange for 5,468,379 shares of FTE stock (later reduced to 4,193,684 shares of FTE stock in order to fall below the applicable 20% New York Stock Exchange ("NYSE") and Securities and Exchange Commission ("SEC") threshold), which the board approved.

39.     During the same meeting, Singal presented the FTE Board with a portfolio of properties owned and managed by the Szkaradeks, through Vision Property Management, LLC and VPM Holdings, LLC (collectively "Vision").  At the time of the meeting, the Vision portfolio consisted of approximately 3,500 properties across 46 states and was purportedly valued at $350 million, including $82 million of debt.

40.     On December 9, 2019, the FTE board learned that the share issuance to Singal was never registered or disclosed, as required by NYSE listing rules, and that the shares issued by then-CEO Stephen M. Goodwin, exceeded the 20% threshold of then-outstanding shares of FTE, another violation of NYSE listing rules.

41.     Consequently, FTE immediately terminated Goodwin, replacing him with Beys, and contacted the NYSE to disclose the share issuance improprieties.

42.     On December 11, 2019, the NYSE suspended trading of FTE stock.

43.     On December 16, 2019, the SEC issued a press release announcing a series of securities fraud charges against Singal for defrauding investors of First Capital Real Estate

Investments LLC, First Capital Real Estate Advisors LP, and First Capital Real Estate Trust Inc. (collectively, the "FC REIT").[4]

44.    None of the directors or officers of FTE previously possessed any knowledge of the fraud charges against Singal, at least not de Silva and Beys, those without ties to Singal.  That is to say, Cunningham, Ghishan and Goodwin claimed they were not aware of the charges or investigation.

45.    On the back of the SEC's charges against Singal and the share issuance improprieties (also to Singal), the NYSE commenced the de-listing procedure of FTE stock on the following day, December 17, 2019.

46.    Despite the pending SEC charges against Singal and the de-listing of FTE stock, the Szkaradeks insisted that they wanted to complete the Vision portfolio transaction, which was to be largely paid for by FTE's soon-to-be de-listed stock.

47.    The Szkaradeks represented to FTE that Singal was merely a broker, and that Singal would not be further involved in the Vision transaction or FTE's affairs.  The Szkaradeks insisted, however, that Singal be paid a whopping $100 million finder's fee for the Vision transaction.

48.    Over the next two weeks until closing on December 30, 2019, the deal was restructured to ensure that no consideration would go from FTE to Singal, his family members or his affiliates.  Rather, any amounts payable to Singal would instead be paid directly to the victims of Signal's SEC fraud, the shareholders of the FC REIT.

49.    As part of the due diligence, FTE relied on a report from Collateral Analytics, which had been introduced to FTE by the Szkaradeks, and which was based on comparisons from the geographic areas of the properties.  The report, however, did not take into account material

---

[4] *See* https://secinvestigations.org/2019/12/16/sec-charges-suneet-singal-first-capital-real-estate-investments-llc-first-capital-real-estate-advisors-lp-and-first-capital-real-estate-trust-inc/

information known to and concealed by the Szkaradeks, namely, the extent of the liabilities attached to the properties due to the fraudulent rent-to-own scheme perpetrated by the Szkaradeks.

50.     Among other things, the Szkaradeks did not disclose the number and volume of consumer complaints that had been lodged against Vision throughout various states.

51.     The existence of these liabilities effectively rendered the properties radioactive from a market perspective.

52.     Without knowing the full extent of Vision's then existing and future liabilities (which were known to the Szkaradeks but willfully and purposefully concealed from FTE), FTE closed on the Vision portfolio on December 30, 2019.[5]

53.     Under Article 3 of the Purchase Agreement, **REPRESENTATIONS AND WARRANTIES RELATING TO THE COMPANIES**, Section 3.3, Conflicts; Consents of Third Parties, stated in pertinent part:

>     (b)     None of the execution and delivery by the Company of the Company Documents, the consummation of the Transaction or the other transactions contemplated hereby or thereby, or full and timely compliance by the Company with any of the provisions hereof or thereof will result in the creation or imposition of any Lien (other than Permitted Exceptions) on any properties or assets of the Company.

54.     In a similar vein, Section 3.4, Capitalization; Indebtedness, stated in pertinent part:

>     (a)     The Equity Interests are free and clear of all Liens.

55.     Notably, Section 3.14 of the Purchase Agreement, Litigation, provided:

>     (a)     [S]ince January 1, 2015 there have not been any Legal Proceedings pending or, to the Knowledge of the Sellers, threatened (i) against or by the Company, (ii) against or by the Sellers relating to the Company or regarding any of their assets or properties, or (iii) against or by the Sellers or the Company that challenges or seeks to enjoin, prevent or otherwise delay, the Transaction or the other transactions contemplated by this Agreement or any of the Transaction Documents.  To the Knowledge of the Sellers, no event has occurred or circumstance exists that could

---

[5] A true a correct copy of the Purchase Agreement is attached hereto as Ex. D.

reasonably be expected to give rise to, or serve as the basis for, any Legal Proceeding.

(b)      [S]ince January 1, 2015 the Company is not and has not (i) been in default under or in breach of any Order, (ii) received any written notification or communication from any Governmental Body asserting that the Company is not in compliance with any Order or (iii) been party or subject to any Order.  There are no unsatisfied judgments, penalties or awards affecting the Company or any of its properties, rights, or assets.

56.      Moreover, Section 3.15, <u>Compliance with Laws; Permits</u>, stated in pertinent part:

(a)      [T]he Company and the Business are, and since January 1, 2015 has complied with, in each case in all material respects, all applicable Laws, including without limitation with respect to mortgage lending, consumer protection, seller financing, installment sale contract, purchase money mortgage, contract for deed, and lease with option to purchase Laws…[S]ince January 1, 2015, none of the Companies has received any written notification or communication from any Governmental Body asserting that the Company is not in compliance with any applicable Law, including without limitation with respect to mortgage lending, consumer protection, seller financing, installment sale contract, purchase money mortgage, contract for deed, and lease with option to purchase Laws.

57.      With those provisions of the Purchase Agreement in mind, the Szkaradeks consummated the transaction and professed that their business and portfolio was not subject to any liens, pending or threatened litigation, and that they had complied with all applicable Laws.

58.      In connection with the closing, the Szkaradeks conspired with Singal to knowingly misrepresent and/or intentionally conceal the following:

a.   Although the brick-and-mortar value of the portfolio was arguably $350 million – based on a valuation report arranged by Vision – it was not disclosed that the majority of properties in the portfolio, which were subject to a national lease-to-own scheme orchestrated by the Szkaradeks, were unsellable and virtually impossible to collect rent from.  These properties actually provided a negative value to the portfolio;

    b.  The Szkaradeks falsely represented that they were nearing a settlement with the Attorney General of Pennsylvania for pending claims when in reality no such agreement was remotely close;

    c.  No disclosure was made of pending homeowner complaints in Michigan, Ohio, and numerous other states to their respective Attorneys General, which were known precursors to private class actions and state regulatory actions filed by the Attorneys General;

    d.  No disclosure of the massive tax obligations and utility deficiencies owed by Vision;

    e.  Fraudulently misrepresented that Singal was merely a one-time broker in the transaction, while concealing the very basis of the relationship between the Szkaradeks and Singal as partners and co-conspirators.

59. Moreover, in or around October of 2019, the Szkaradeks consulted with a bankruptcy attorney, Michael Beal, demonstrating that the Szkaradeks knew that the Vision portfolio properties had little to no value, and were effectively underwater.

60. Among the persons aware of Vision's liabilities prior to the closing are Eric Taylor (then existing property manager), John Pincelli, Esq. (attorney for Vision), and Todd Merson.

61. As part of the transaction, the Szkaradeks were paid $250,000 in cash (which was paid directly to settle a Vision legal matter) and were provided a promissory note of $9.75 million to be paid by January 2020.

62. The Szkaradeks also received $228 million of preferred FTE shares, on the basis that the trading of FTE stock, once re-listed, would properly price the value of the transaction.

**C.** **The Conspiracy with Bansal to Return Unencumbered Properties to the Szkaradeks**

63.     In order to facilitate the closing of the initial transaction, FTE formed US Home Rentals, LLC ("USHR") to run the portfolio of properties purchased from the Szkaradeks.

64.     As part of the original transaction, FTE had agreed to return a subset of approximately 280 properties to the Szkaradeks, which were operated and maintained by another Szkaradek entity named FixPads.

65.     On September 25, 2020, upon the insistence of the Szkaradeks, FTE hired Munish Bansal as the CEO of USHR.  Unbeknownst to FTE, Bansal was conspiring with Singal and the Szkaradeks to further the second act of their fraudulent scheme.  The second act was to: (i) take control of FTE's Board and management; (ii) expedite the transfer of the most favorable FixPads properties to the Szkaradeks; and (iii) push FTE into bankruptcy so that the Szkaradeks could take back its properties free and clear of their liabilities.

66.     Shortly after Bansal took over as CEO of USHR, Vision's former property manager, Eric Taylor, attempted to inform FTE that Vision's portfolio was grossly underwater, and was not worth what had been previously represented by the Szkaradeks and Singal.

67.     Bansal and other Singal-planted board members disputed Taylor's allegations, and Bansal retaliated by firing Taylor on November 23, 2020.

68.     In addition to firing Taylor, Bansal continuously pressed to transfer desirable, lien-free FixPads properties to the Szkaradeks.

69.     When FTE refused, the Szkaradeks systematically began transferring FixPads properties owned by USHR/FTE without the authorization of FTE.

70.     In transferring these properties, the Szkaradeks were not only pocketing the equity in the properties, but in some cases, they failed to obtain the consent of Inmost Partners, LLC

("Inmost"), FTE's largest lender with a managerial security interest in the majority of the Vision properties.

71.     For its part, Direct Lending Partners ("DLP"), another Vision-legacy secured creditor, allowed these unauthorized transactions by providing payoff letters and applying the proceeds of these sales to pay down debt owed under the DLP loans.

72.     At one point, to accomplish their fraudulent transfers of these properties, the Szkaradeks opened TD Bank accounts, and failed to provide FTE with access to these accounts.[6]

73.     In addition to firing Taylor, Bansal actively sabotaged rehab efforts of USHR's properties to the point that employees questioned Bansal's decision-making and motives.

74.     On December 30, 2020, as a direct result of the actions taken by the Szkaradeks, Inmost exercised its managerial security interests in the majority of the portfolio purchased from the Szkaradeks.

75.     In early 2021, FTE began selling a small portion of the properties purchased from the Szkaradeks to help cover the expenses needed to run the portfolio.  At that time, FTE soon realized that the properties it had purchased from the Szkaradeks were effectively radioactive to the market due to the fraudulent rent-to-own scheme, and the growing number of state and consumer liabilities.

76.     Specifically, FTE learned that it could not sell a vast majority of the properties due to injunctions, stop orders, and other actions taken by State Attorneys General and consumer protection groups in other states, such as Maryland, Michigan, New Jersey, New York, Ohio, and Wisconsin.

---

[6] *See* Ex. E (Attachments from email by M. Fernandez to A. Szkaradek, dated May 18, 2021)

77.     As originally intended, the Vision transaction was to be paid through an exchange of FTE common stock, with FTE always maintaining the controlling voting rights of the company. FTE, however, was ultimately de-listed.

78.     On April 2, 2021, FTE and the Szkaradeks therefore amended the consideration paid to the Szkaradeks as follows:

> a.  The promissory note of $9.75 million was increased to approximately $10.7 million to account for accrued interest and certain debt paydowns made to FTE's creditors (by way of FixPads sales made without FTE's consent);
>
> b.  40% of the common equity in FTE; and
>
> c.  $20 million of preferred shares, which could be converted into another 9% of equity, which would provide up to 49% total equity in FTE.

79.     The amendment also required FTE to deed back all of the FixPads properties to the Szkaradeks free and clear, which were approximately 220 at the time, down from nearly 280.

80.     Importantly, as a material part of the amendment, the Szkaradeks were prohibited from transferring any of their shares to Singal, family members or affiliates.[7]

81.     Yet, true to form, in furtherance of the conspiracy with Singal, the Szkaradeks have attempted to transfer substantial amounts of their consideration – debt, preferred equity and common equity of FTE – to Singal's affiliates and family members, in direct violation of the April 2021 Amendment.

82.     The Szkaradeks and their conduits and affiliates have conspired to complete the transfer of assets in ways designed to avoid detection, including the use of a Wyoming shell company.

---

[7] A true a correct copy of the April 2021 Amendment is attached hereto as Ex. F.

83.     The scheme to take control of FTE's management began as early as April 2020 when Singal sought to transfer 500,000 of his shares in a private secondary transaction to Innovativ, which at the time, did not sound off any alarm bells and was approved by FTE.

84.     But later events would reveal that this was just the first step in a long-orchestrated scheme by Singal and the Szkaradeks to take over control of FTE.

85.     Under the April 2021 Amendment, FTE was to distribute no more than 49% of its shares as consideration for the Vision transaction, none of which was to touch the hands of Singal, his family members or his affiliates.

86.     In October 2019, Singal had previously acquired approximately 20% of FTE's then outstanding common shares due, in part, to his knowingly false representations that he would secure further future financing for FTE.  Specifically, on October 22, 2019, the FTE Board approved the issuance of 4,193,684 shares of FTE common stock to TTP8, an entity owned and controlled by Singal, in connection with the conversion of approximately $2 million in unsecured debt (a large portion of this unsecured debt belonged to Chris Ferguson, a former member of FTE's board of directors).[8]

87.     In early 2020, pursuant to a Court Order issued by the Common Pleas Court of Allegheny County, Pennsylvania (the venue of a pending suit in which the Szkaradeks and certain affiliated entities were sued for, among other things, having allegedly engaged in a series of fraudulent practices involving Pennsylvania consumers), the Szkaradeks were enjoined from transferring any consideration received in connection with the Vision Purchase Agreement and agreed to assign any proceeds or consideration received in connection with the Vision Purchase Agreement into an escrow account controlled by the Commonwealth.

---

[8] On information and belief, Singal and TTP8 have not paid any of the unsecured debt holders any money for the debt Singal and TTP8 acquired from them.

88.     Shortly after the injunction was issued, Singal and TTP8 proceeded to transfer nearly all of their preexisting FTE common shares to affiliates.

89.     In or around May 2020, TTP8 transferred 702,000 of its 4,193,684 shares of FTE common stock to Khawaja Zargham bin Aamer, a TTP8 employee, purportedly as payment for certain deferred compensation.  The parties to the transfer provided FTE with an opinion of counsel as to why this transfer qualified for an exemption under Securities laws. This opinion was rendered by Ronald J. Logan with Logan Law Firm PLC.

90.     In or around May 2020, TTP8 transferred 891,566 of its 4,193,684 shares of FTE common stock to Danish Mir, another TTP8 employee, also purportedly as payment for certain deferred compensation.  Again, the parties to the transfer provided an opinion of counsel to FTE as to why this transfer qualified for an exemption under Securities laws. This opinion was also rendered by Ronald Logan.

91.     In or around May 2020, TTP8 "distributed" 1,790,118 of its 4,193,684 shares of FTE common stock to Singal's wife, Majique Ladnier, pursuant to a stock distribution agreement. Ronald Logan noted that this distribution did not amount to a change in beneficial ownership, as Singal and Ladnier were spouses and, as such, held an undivided interest in TTP8.

92.     Finally, in or around May 2020, TTP8 transferred 500,000 of its 4,193,684 shares of FTE common stock to Innovativ, purportedly in satisfaction of debt owed to Innovativ. An opinion as to why this transfer qualified for an exemption under Securities laws was also rendered by Ronald Logan.

93.     Singal, by and through TTP8, retained only 310,000 shares of the original 4,193,684 shares of FTE common stock.

94.     While these transfers were taking place, FTE and the Szkaradeks discussed amending the Vision Purchase Agreement to reflect FTE's current circumstances.  For many months, however, Alex Szkaradek refused to amend the agreement until one of his key demands was met – the appointment of Munish Bansal as the CEO of US Home Rentals LLC, the real-estate subsidiary of FTE and its main asset.

95.     On September 25, 2020, after six months of deliberations and discussions (spearheaded by Ghishan on an almost daily basis, and supported by Goodwin and Cunningham), FTE appointed Munish Bansal as USHR's CEO.

96.     On numerous occasions, Bansal was expressly directed not to have any contact with Singal, as were other members of the Board and management of FTE, and Bansal repeatedly claimed to understand and comply with this directive.  Nevertheless, FTE recently learned that Singal, Bansal and the Szkaradeks were separately convening calls and exchanging emails through at least December 2020.[9]

97.     With Bansal's appointment in hand, the Szkaradeks were prepared to resume their discussions with FTE regarding an amendment to the Vision Purchase Agreement.

98.     On April 2, 2021, after more than 18 months of negotiations in which Cunningham, Ghishan, Goodwin and Bansal were advocating strenuously for the Szkaradeks, FTE finally executed an amendment to the Vision Asset Purchase Agreement.

99.     The 2021 April amendment to the Vision Purchase Agreement also contained a prohibition on any transfers of FTE stock to Singal, his family members or affiliates.[10]

_____

[9] It is becoming increasingly clear that Cunningham and Ghishan were also speaking to Singal during all relevant time periods, without disclosing their communications to FTE.

[10] Several weeks later, Ghishan began negotiations to resign from the FTE board, and a resignation agreement was executed in August 2021.  Similarly, Goodwin ceased to participate in FTE's board meetings, or in management, shortly after the signing of the April amendment to the Vision Purchase Agreement.

100.   Despite this prohibition, a few months later the Szkaradeks began to do just that – to transfer their FTE stock to Singal and his affiliates – though in a way designed to avoid detection.

101.   Specifically, on October 7, 2021, Erik Doerring (Alex Szkaradek's attorney) informed FTE that Alex and Antoni Szkaradek were transferring the common stock, preferred stock and promissory notes received in connection with the Vision transaction to Redemption SPV, LLC, a newly formed Wyoming LLC, owned and controlled by the Szkaradeks.[11]

102.   On November 12, 2021, FTE received another email from Doerring attaching copies of (i) a common stock purchase and sale agreement, dated November 10, 2021, between the Szkaradeks and Innovativ (the "Innovativ Agreement") (to whom Singal and TTP8 transferred 500,000 FTE shares in May 2020), and (ii) a membership interest purchase agreement, dated November 10, 2021, between the Szkaradeks and EEME LLC, an entity controlled by Majique Ladnier, Singal's wife (the "Ladnier Agreement").

103.   The Innovativ Agreement purports the transfer 11,031,688 shares of FTE common stock to Innovativ in exchange for 7,545,600 units of membership interest of CF RE-CPC SPV II LLC, a Wyoming entity owned by Innovativ.

104.   The Ladnier Agreement purports to transfer the Szkaradeks' promissory notes and preferred stock in exchange for 1,454,400 units of membership interest of CF RE-CPC SPV II LLC, the same Wyoming entity owned by Ladnier, EEME LLC.

---

[11] On October 22, 2021, FTE received an email from Doerring attaching the memorialized agreement between the Szkaradek's and the FC REIT in connection with the transfer of 11,031,688 shares to the FC REIT, as required in the April amendment to the Vision Purchase Agreement.  However, as of today, the transfer of these shares from the Szkaradeks to the FC REIT has not occurred.  In fact, as set forth below, Singal and the Szkaradeks are controlling the shares earmarked for FC REIT as their own.

105.    These transfers and agreements violated several provisions of law including, among other things: (i) the Singal prohibition under the amended Vision Asset Purchase Agreement; and (ii) the Pennsylvania Court Order, which enjoined the Szkaradeks from transferring or otherwise disposing of the consideration received in connection with the Vision Asset Purchase Agreement.

106.    Shortly thereafter, on December 21, 2021, FTE received a letter from Barry Kazan, an attorney representing Tom Coleman of Innovativ, one of Singal's original transferees, demanding to inspect FTE's books and financial records.  FTE informed Mr. Kazan that, upon advice from FTE's Nevada counsel, Mr. Coleman was not entitled to inspect FTE's financial records given his holdings fell below 1% of FTE's issued and outstanding stock.

107.    Just over a month later, on February 3, 2022, it became abundantly clear that Innovativ, Singal, his other affiliates, the Szkaradeks, and their appointees to the Board and management of FTE, had been working together – in secret – all along.

108.    Specifically, FTE received a letter from Innovativ's Nevada counsel (who has since confirmed that he also represents Singal), containing a written consent purporting to amend FTE's bylaws.  The 17 signatories to this purported written consent included Singal, the Szkaradeks and all their aforementioned (attempted or purported) transferees as follows:

a.  Majique Ladnier (signing in her individual capacity);
b.  Danish Mir (signing in his individual capacity);
c.  Khawaja Zargham bin Aamer (signing in his individual capacity);
d.  First Capital Master Advisor, LLC (signed by Singal in his capacity as Manager);
e.  Alex Szkaradek (signing in his individual capacity);
f.  Antoni Szkaradek (signing in his individual capacity);
g.  Stephen Goodwin (signing in his individual capacity);
h.  Peter Ghishan (signing in his individual capacity);
i.  Joseph Cunningham (signing in his individual capacity);
j.  TTP8, LLC (signed by Majique Ladnier in her capacity as an authorized signatory);
k.  Innovativ Media Group, Inc. (signed by Tom Coleman in his capacity as CEO); and

l.   Chris Ferguson, from whom Singal and TTP8 first acquired FTE common stock through the aforementioned conversion of unsecured debt (an unsigned signature block).

109.   Notably, the shareholders signing the written consent claimed to speak for, and thereby exercise control over, the 11,031,688 shares designated for the FC REIT.  But in fact, the FC REIT categorically and vehemently deny any participation in the written consent and claim that their FTE shares were used without their authorization.

110.   Immediately upon receiving the written consent, the general counsel for FTE sent an email to Cunningham, a current director, asking him how his signature appeared on the written consent, and other FTE personnel also confronted him.

111.   Based on his responses and lack thereof, Cunningham admitted that he had spoken with Coleman of Innovativ, and it became unmistakably clear that he had been passing confidential information to the Singal and Szkaradek group of shareholders.

112.   It is now unmistakably clear that Cunningham, Ghishan, Goodwin and Bansal were acting solely on behalf of Singal and the Szkaradeks, continuously passing highly confidential information and violating countless contractual agreements, securities laws and other legal provisions, throughout the period of their involvement in the board and management of FTE.

**FIRST CAUSE OF ACTION**
**(Fraudulent Inducement and Fraud)**

113.   Plaintiff repeats and re-alleges the allegations of each of the foregoing paragraphs.

114.   The Szkaradek's in conjunction with Singal have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to fraudulently induce Plaintiff into entering the Purchase Agreement.

115.   By and through each of the Szkaradeks' business relationships with one another and Singal, their close coordination with one another in the affairs of the Vision portfolio, each

knew the status and nature of the Vision portfolio, including liens, encumbrances, and ongoing litigation. Moreover, through the same connections and coordination, each knew that each other were engaged in a conspiracy to fraudulently induce Plaintiff into the Purchase Agreement providing negative equity.

116.    The Szkaradeks, in conspiracy with Singal, agreed to facilitate, conduct, and participate in the conduct, management, or operation of Vision's affairs in order to procure millions of dollars in exchange for a portfolio of extremely compromised properties. In particular, the Szkaradeks, in conspiracy with Singal, were a knowing, willing, and active participant in Vision and its affairs, and each shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit and collect upon their fraudulent misrepresentations, including the Purchase Agreement.

117.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of Vision's affairs in order to commit fraud.

118.    The participation and agreement of each Defendant was necessary to allow the commission of this scheme.

119.    Plaintiff has been and will continue to be injured in their business and property by reason of the Defendants' fraud, in an amount to be determined at trial.

120.    The injuries to Plaintiff were directly, proximately, and reasonably caused by these fraudulent misrepresentations and conspiracy to commit fraud.

121.    Plaintiff has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' unlawful activities.

## SECOND CAUSE OF ACTION
### (Tortious Interference with Contract)

122.    Plaintiff repeats and re-alleges the allegations of each of the foregoing paragraphs.

123.     The Purchase Agreement expressly provides that no FTE stock may be transferred directly or indirectly to Singal, his family members, or his affiliates.

124.     The April 2021 Amendment included a similar prohibition.

125.     Singal was at all relevant times fully aware of these contractual prohibitions.

126.     Despite these clear prohibitions, the Szkaradeks and Singal have conspired with each other to tortiously interfere with these contracts by surreptitiously transferring more than 11 million shares of FTE (which were promised to be transferred to the primary victims of Singal's SEC fraud, the shareholders of the FC REIT), to Singal, his family and/or his affiliates through the use of sham Wyoming shell companies Innovativ and TTP8.

127.     Specifically, the Szkaradeks, in conspiracy with Singal, have agreed to transfer 11,031,688 of their own FTE common shares to Innovativ, an affiliate of Singal that is acting in concert with Singal, his family members and/or affiliates.

128.     The Szkaradeks, in conspiracy with Singal, have also transferred 467,714 shares of their own FTE common shares to TTP8, which is owned by Singal's wife, Majique Ladnier.

129.     The Szkaradeks, in conspiracy with Singal, have also transferred 308,305 shares of their own FTE common shares to First Capital Master Adviser, LLC, which is an affiliate of Singal.

130.     The transfer of these FTE shares is a direct breach of both the Purchase Agreement and the April 2020 Amendment.

131.     If Singal, his affiliates, and family members are not disgorged of these FTE shares and/or enjoined from receiving any further FTE shares, FTE and its shareholders will be irreparably harmed by allowing Singal to possess and/or control a contractually prohibited equity interest in FTE, even though he is currently under a federal indictment for wire and mail fraud, has been banned from the securities industry for a period of ten years, and is prohibited from acting as

an officer or director of a public company.  Simply put, Singal must not be allowed to have any association or control over the affairs of FTE.

### THIRD CAUSE OF ACTION
**(Indemnification)**

132.     Plaintiff repeats and re-alleges the allegations above.

133.     Plaintiff seeks indemnification from the Szkaradeks pursuant to Article 7 of the Purchase Agreement, **INDEMNIFICATION**.

134.     Specifically, Section 7.2 of **EXHIBIT A**, <u>Indemnification</u>, provides the agreed upon grounds for initiating such an action, stating in pertinent part:

> (a)     From and after the Closing, the Sellers hereby agree to indemnify and hold Parent, Acquisition Sub, the Companies and their respective direct and indirect equity holders, directors, managers and officers…harmless from, against and in respect of, any and all Losses which may be sustained, suffered or incurred by, or imposed on, any of the to the extent resulting from, related to or arising out of: (i) any misrepresentation or any breach of warranty made by the Sellers in this Agreement or in any Transaction Document; (ii) any breach of, or failure to fully and timely comply with, any any covenant, agreement, or obligation of the Sellers set forth in this Agreement or in any Transaction Document; (iii) Pre-Closing Liabilities, (iv) Pre-Closing Taxes, (v) any Excluded Liabilities, (vi) any Indebtedness for which no Outstanding Indebtedness Letter has been delivered by Sellers, (vii) any Transaction Expenses not included on the Payment Allocation Schedule, (viii) any of the matters set forth on <u>Schedule 3.3(a)</u>, <u>Schedule 3.15(a)</u>, <u>Schedule 3.15(b)</u> or <u>Schedule 4.4</u>, and (ix) the Rehab Properties.

135.     The Szkaradeks failed to obtain the necessary consents required under the Notice Issuance and Purchase Agreements dated as of August 8, 2017 among DSV 1 LLC, DSV 2 LLC, DSV 3 LLC, certain Noteholders, Inmost Partners LLC ("Inmost") as Noteholder Agent, and Fleming Financial Services P.C., as Administrative Agent ("NIPAs") from Inmost and the Noteholder under the NIPAs and the related transaction documents pursuant to which the Equity Interests were pledged as collateral to Inmost for the benefit of the Noteholder.

136.     As a direct result of the Szkaradeks' failure to obtain the consents required under

-24-

the NIPA, the Szkaradeks' representation and warranty in Section 3.3 of the Purchase Agreement that no such consents were necessary were knowingly false.

137.    Additionally, the Szkaradeks' representation and warranty in Section 3.4 of the Purchase Agreement that the Equity Interests were free and clear of all Liens was also a material factual misrepresentation as they had been pledged to secure amounts allegedly due under the NIPAs.

138.    As a direct result of the breaches of these representations and warranties, the Noteholder have purportedly taken operational control of the SPVs to the exclusion of FTE, are in the process of attempting to transfer properties from the SPVs to third parties, have terminated the flow of management fees to FTE, and are otherwise causing FTE to incur ongoing material losses.

139.    Further, Plaintiff has incurred, and continues to incur, material losses stemming from the ongoing litigation initiated by the Attorney Generals and consumer protection groups of Pennsylvania, Michigan and other states against the Szkaradeks for their long-running involvement in a nationwide scheme that deceptively and unfairly took advantage of low-income consumers, including many Pennsylvania citizens, by and through Vision Property Management, LLC and VPM Holdings, LLC.

140.    The Szkaradeks being the subject of multiple ongoing lawsuits werd in direct violation of the representations made in Sections 3.14 and 3.15 of the Purchase Agreement.

141.    Plaintiff incurred losses based on injunctive relief entered on November 8, 2021 by the Court of Common Pleas for Allegheny County against the Szkaradeks, which ordered the transfer of properties – most of which were owned by the SPVs – to the tenants of the properties.

142.    The losses directly attributable to the fraud claims brought against Defendants currently exceed $500,000.

143.    Plaintiff reasonably anticipates additional losses based on the claims of consumer advocacy groups in Michigan which seek injunctive relief similar to that granted in Pennsylvania and which arise from allegations of fraud and violations of law in excess of $500,000.

144.    Moreover, Plaintiff reasonably expects ongoing losses based on allegations of fraud and violations of law in the states of Illinois, Delaware, Maryland, New Jersey, New York, Ohio, Wisconsin and other states.

145.    The Szkaradeks made these material misrepresentations knowingly and intentionally in order to mislead FTE into completing the Vision portfolio transaction, in direct violation of the Purchase Agreement, causing Plaintiff to incur, and continue to incur, financial and reputational losses.

**FOURTH CAUSE OF ACTION**
**(Civil Conspiracy)**

146.    Plaintiff repeats and re-alleges the allegations of each of the foregoing paragraphs.

147.    Defendants, in conjunction with Singal, have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to fraudulently induce Plaintiff into entering the Purchase Agreement, as described above, in violation of Sections 3.3, 3.4, 3.14, and 3.15 of same.

148.    By and through each of the Defendants' business relationships with one another and Singal, their close coordination with one another in the affairs of the Vision portfolio, each Defendant knew the status and nature of the Vision portfolio, including liens, encumbrances, and ongoing and threatened litigation.  Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to fraudulently induce Plaintiff into the Purchase Agreement providing negative equity.

149.    Each Defendant, in conjunction with Singal, agreed to facilitate, conduct, and participate in the conduct, management, or operation of Vision's affairs in order to procure millions of dollars in exchange for a portfolio of extremely compromised properties.  In particular, each Defendant was a knowing, willing, and active participant in Vision and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit and collect upon their fraudulent misrepresentations, including the Purchase Agreement.

150.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of Vision's affairs in order to commit fraud.

151.    The participation and agreement of each Defendant, as well as Signal, was necessary to allow the commission of this scheme.

152.    Plaintiff has been and will continue to be injured in its business and property by Defendants' violations of the Purchase Agreement in an amount to be determined at trial.

153.    The injuries to the Plaintiff directly, proximately, and reasonably foreseeably resulting from or caused by these violations of the Purchase Agreements include, but are not limited to, millions of dollars in improperly collected loan payments.

154.    Plaintiff has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' fraudulent conspiracy.

**FIFTH CAUSE OF ACTION**
**(Breach of Contract and injunctive relief)**

155.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

156.    As a direct result of the SEC charges filed against Singal, a material condition of the purchase of the Vistion portfolio of properties was that Singal would not have any involvement in the Vision properties or the board or management of FTE.

157.    Indeed, included in the original Purchase Agreement, **EXHIBIT D**, the parties expressly agreed that no FTE stock would be transferred directly or indirectly to Singal, his family members, or his affiliates.

158.    The April 2021 Amendment included a similar prohibition.  *See* **EXHIBIT F**, **Section 4.7(b).**

159.    Despite the clear prohibitions contained in both the Purchase Agreement and the April 2021 Amendment, the Szkaradeks and Singal have conspired with each other to withhold 11,031,688 shares of FTE, which were promised to be transferred to the primary victims of Singal's SEC fraud, the shareholders of the FC REIT.

160.    In addition to withholding shares that were promised to go to the FC REIT, the Szkaradeks have also agreed to transfer 11,031,688 of their own FTE common shares to Innovativ, an affiliate of Singal that is acting in concert with Singal, his family members and/or affiliates.

161.    Finally, Singal and the Szkaradeks have conspired with each other to transfer promissory notes and preferred shares of FTE to Singal, his family and/or his affiliates through the use of sham Wyoming shell companies.

162.    These transfers of FTE shares and other securities are a direct breach of both the Purchase Agreement and the April 2021 Amendment.

163.    If the Szkaradeks and Singal are not enjoined from transferring these FTE shares, FTE and its shareholders will be irreparably harmed by allowing Singal to possess a larger equity interest in FTE, even though he has been banned from the securities industry for a period of ten years and is prohibited from acting as an officer or director of a public company.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, FTE demands judgment in its favor against Defendants, jointly and severally, and seek a judgment:

a)     Directing the Szkaradeks to transfer 11,031,688 shares of FTE stock to the FC REIT;

b)     Enjoining the Szkaradeks from exercising any rights, including voting rights, under the 11,031,688 shares that were pledged to the FC REIT;

c)     Enjoining the Szkaradeks from transferring or pledging any FTE common or preferred shares to Singal, his affiliates, and family members;

d)     Enjoining the Szkaradeks from transferring any FTE common or preferred shares of stock to Innovativ;

e)     Disgorging all FTE shares of stock possessed by the Szkaradeks, their family members, and affiliates and directing those shares to be returned to FTE;

f)     Awarding compensatory, direct, consequential, and punitive damages, including prejudgment interest, in an amount to be determined at trial;

g)     Requiring Defendants to pay Plaintiffs' attorneys' fees and costs; and

h)     Any further relief deemed appropriate by the Court.

Dated:  June 13, 2022

**WHITE AND WILLIAMS LLP**

By: /s/ Joseph J. Bellew
    Joseph J. Bellew (#4816)
    600 N. King Street, Suite 800
    Wilmington, DE 19801
    Phone:  302.467.4534
    bellewj@whiteandwilliams.com

    Of Counsel:

    Shane R. Heskin, Esq.
    1650 Market Street, Suite 1800
    Philadelphia, PA 19103-7395
    (215) 864-6329
    heskins@whiteandwilliams.com
    *Attorneys for FTE Networks, Inc.*

29019311v.1