# EXHIBIT A

2019 WL 6827346 (S.D.N.Y.) (Trial Pleading)
United States District Court, S.D. New York.

SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

Suneet SINGAL, First Capital Real Estate Trust Inc., First Capital Real Estate
Advisors, LP, and First Capital Real Estate Investments, LLC, Defendants.

No. 1:19-CV-11452.
December 13, 2019.

**Complaint**

Derek S. Bentsen (DB-8369), Joshua E. Braunstein (pro hac to be filed), Matthew F. Scarlato (pro hac to be filed), Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549, Telephone: (202) 551-6426 (Bentsen), Email: BentsenD@sec.gov, for plaintiff.

JURY TRIAL DEMANDED

Plaintiff Securities and Exchange Commission ("Commission" or "SEC"), files this Complaint against Defendants Suneet Singal ("Singal"), First Capital Real Estate Trust Inc. ("FC REIT"), First Capital Real Estate Advisors, LP ("FC REIT Advisor"), and First Capital Real Estate Investments, LLC ("FC Private"), and alleges as follows:

*SUMMARY*

1. This case is about two separate frauds Suneet Singal perpetrated that involved two public companies—a real estate investment trust ("FC REIT") and a business development company ("BDC")—between September 2015 and at least March 2018.

2. In the fraud involving FC REIT, Singal purported to contribute 12 hotels *that he did not own* to close a business deal related to FC REIT that personally benefitted him. He then made numerous material misrepresentations in public SEC filings concerning FC REIT's ownership of the hotels. As part of the deal, Singal received consideration valued at more than $15 million for the hotels. Singal's sham contribution diluted the value of FC REIT's shares and resulted in FC REIT selling shares at inflated prices to unsuspecting investors.

3. With respect to the BDC, Singal engaged in a course of fraudulent conduct while he was a director and investment adviser to the BDC, and he owed a fiduciary duty to the BDC. As a fiduciary, Singal had a duty to act in the best interests of the BDC, to employ reasonable care to avoid misleading the BDC, and to not engage in self-dealing. Instead, and in breach of that duty, Singal lied about his conflicts of interest and misappropriated money that the BDC lent—as its largest investment—to a company he secretly controlled ("Company A").

4. Singal further breached his fiduciary duty by failing to monitor and provide advice about the BDC's investments as required by the advisory contract. Singal failed to disclose the deteriorating financial condition of Company A, which he directly caused by misappropriating more than $2 million from it and by taking out fraudulent loans against it. His misconduct drove Company A into bankruptcy, resulting in a total loss of the BDC's investment. Singal also made material omissions in SEC public filings concerning his relationship with Company A.

5. By engaging in the fraudulent conduct described in this Complaint, Singal and the Defendant entities named above violated the federal securities laws as set forth in the Claims Section below.

6. Unless permanently restrained and enjoined, Defendants are reasonably likely to continue to violate the federal securities laws. For that reason, the Commission seeks the equitable and monetary relief set forth below.

### JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77v(a)]; Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]; Section 214 of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-14], Section 44 of the Investment Company Act of 1940 ("Company Act") [15 U.S.C. § 80a–43]; and 28 U.S.C. § 1331.

8. Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 214 of the Advisers Act [15 U.S.C. s 80b-14], and Section 44 of the Company Act [15 U.S.C. § 80a–43], because certain of the acts, practices, transactions, and courses of business constituting the violations alleged herein occurred within this judicial district. For example, during all relevant times, FC REIT's principal office was located in New York, New York, and Singal engaged in many of the acts described in this Complaint there.

9. In connection with the transactions, acts, practices, and courses of business alleged in this Complaint, Defendants have directly or indirectly made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange.

### DEFENDANTS AND RELEVANT ENTITIES

#### I. Defendants

10. **Suneet Singal** ("**Singal**"), age 41, resides in El Dorado Hills, California. Singal is the Chief Executive Officer ("CEO") and chairman of FC REIT's board of directors, as well as the beneficial owner and CEO of FC REIT Advisor. In addition, Singal owned a 24.9% beneficial ownership interest in the BDC's investment adviser ("BDC Advisor") from October 12, 2016, to April 2, 2017, and was the sole beneficial owner of the BDC Advisor from April 3, 2017, to March 2018. Singal served on the BDC Advisor's investment committee from at least December 2016 to March 2018 and was, during various periods, a director, as well as the Acting CEO and Chief Financial Officer ("CFO") of the BDC. Singal is the sole member and manager of FC Private.

11. **First Capital Real Estate Trust, Inc.** ("**FC REIT**") is a public, non-traded REIT incorporated in Maryland, with its principal office located in New York, New York. Generally, a REIT, or real estate investment trust, is a company that owns income-producing real estate or real estate-related assets. The income-producing real estate assets owned by a REIT may include real assets such as a hotel, an apartment, or commercial building.

12. FC REIT does not have any employees; nor does it have a class of securities registered under Section 12(b) or 12(b) of the Exchange Act; but it is subject to the Exchange Act's reporting obligations pursuant to Section 15(d) because it filed a registration statement that became effective August 15, 2012, and several post-effective amendments that later became effective, the last one on May 8, 2015. FC REIT has been delinquent in its periodic filings with the SEC since the quarter that ended September 30, 2015, but has continued to file current reports on Forms 8-K. FC REIT offered and sold securities—*i.e.*, shares of common stock to the public pursuant to a registration statement filed with the SEC—between August 2012 and April 2016.

13. FC REIT generally does not directly own real estate, but rather owns interests in its operating partnership. FC REIT's operating partnership in turn holds FC REIT's real estate and real estate related assets. The value of FC REIT's operating

partnership interests or units and the common shares it issues to investors are economically equivalent. The REIT's operating partnership sometimes acquires property by issuing operating partnership units ("OP Units") to the seller, as it did with Singal.

14. **First Capital Real Estate Advisors, LP** ("**FC REIT Advisor**") is a Delaware limited partnership headquartered in New York, New York that serves as the external adviser to FC REIT. FC REIT Advisor manages the day-to-day operations of FC REIT and FC REIT's operating partnership, including, among other things, assisting FC REIT in preparing, reviewing and filing all documents FC REIT is required to file with the SEC. Singal beneficially owns FC REIT Advisor.

15. **First Capital Real Estate Investments, LLC** ("**FC Private**"), is a single member California limited liability company, founded by Singal in 2008, that operates as a commercial and residential real estate investment firm and acts as a private holding company for several of Singal's businesses. Singal is the CEO, founding principal, sole member and sole manager of FC Private. Singal conducted most of the business transactions at issue in this Complaint through FC Private.

## II. Relevant Entities

16. **The BDC** was, at all relevant times, an externally managed, non-diversified, closed-end management investment company that elected to be regulated as a business development company under the Company Act. BDCs are deemed to be registered closed-end funds with respect to certain provisions of the Company Act. The BDC was incorporated in Maryland in 2014, and it began operating on February 16, 2017. The Company Act requires a majority of a BDC's directors to be independent directors. Singal served as an interested member of the BDC's board of directors from March 30, 2017 to March 13, 2018, including serving as chairman from March 30, 2017, to September 12, 2017. Singal served as the BDC's acting CFO from June 21, 2017, to March 13, 2018, and as the BDC's acting CEO from September 12, 2017, to March 13, 2018. The BDC offered and sold securities—*i.e.*, shares of common stock to the public pursuant to a registration statement filed with the SEC—between approximately February 3, 2017, and April 28, 2017.

17. **The BDC Advisor** was at all relevant times an unregistered private advisory firm that served as the external investment adviser to the BDC. The BDC had no employees and relied on the BDC Advisor to provide the BDC's executive officers and to manage the BDC's day-to-day investment and administrative operations pursuant to a written investment advisory agreement. Through FC Private, Singal acquired a 24.9% ownership interest in the parent company that owned the BDC Advisor on October 12, 2016, with an option to acquire a controlling interest at a later date. Singal, through FC Private, acquired the remaining ownership interest in the parent company that owned the BDC Advisor on April 3, 2017. The only two investments that the BDC made before Singal acquired a 100% beneficial ownership interest in the BDC Advisor were in Company A, and they were made at Singal's recommendation.

18. Singal was a member of the BDC Advisor's three-person investment committee, which was responsible for approving and managing all BDC investments. The BDC Advisor was compensated under the terms of the advisory agreement for its services through a base asset management fee and an incentive fee based on performance. For example, during 2017, the BDC paid the BDC Advisor more than $28,000 in management fees for its services. Singal sold the BDC Advisor to an unrelated third party on or about March 13, 2018.

19. **Company A**, at all relevant times, was a Nevada limited liability company headquartered in California that owned and operated franchised fast food locations that sold baked goods. Singal, through FC Private, owned 100% of the membership interests in Company A until February 23, 2017, at which point Singal sold 100% of the membership interests to the person who had been managing the day-to-day operations of the business for him (the "Company A Manager") in exchange for an $11.5 million promissory note. Company A filed for bankruptcy on September 14, 2017.

20. **Company B** was, at all relevant times, a Nevada limited liability company that provided human resources and operations services to FC Private and its subsidiaries, including Company A—both before and after the sale. Singal (through FC Private) owned a 50% interest in and controlled, as managing member, Company B. Singal continued to control Company A through

Company B after he sold Company A. An employee of Company B (the "Controller") performed cash management and accounting functions for both Company A and FC Private. This arrangement continued after the sale of Company A until approximately August 2017 and allowed Singal to continue to have the power to exercise a controlling influence over the management and policies of Company A. Company B has since been dissolved.

## FACTS

### I. Fraudulent Conduct Relating to FC REIT

#### A. Singal Fraudulently Purported to Contribute Certain Hotels that He Did Not Own to FC REIT as Part of his Purchase of FC REIT Advisor

21. On September 15, 2015, in connection with his purchase of FC REIT Advisor, Singal, acting through FC Private, purported to contribute to FC REIT certain real estate assets, contract rights, and associated debt with an overall net asset value of $41,777,402. In exchange for this purported contribution, FC REIT issued 3,344,868 OP Units, at a price of $12.49 per OP Unit. At that time, the OP Unit price represented the stated value of a share of FC REIT's common stock.

22. Singal did not have sufficient cash to buy FC REIT Advisor. Consequently, the seller of FC REIT Advisor agreed to have Singal contribute sufficient additional property to enable him to buy FC REIT Advisor without requiring him to pay substantial cash at closing.

23. Singal needed the seller to believe he owned all of the property the parties contemplated he would contribute. That is because Singal would not otherwise have had enough property to contribute to FC REIT, and he would not otherwise have been able to buy FC REIT Advisor.

24. However, Singal did not own some of the properties that he purported to contribute to FC REIT—specifically 12 limited service hotels with an assigned net equity value of approximately $15.2 million ("the Hotels"). For several months, Singal had been in negotiations with the principals of the entities that owned the Hotels at issue (the "Hotel Principals") to buy the Hotels, but Singal had not succeeded in acquiring the Hotels as of September 15, 2015.

25. The Hotels, some of which were in bankruptcy, could not be sold to Singal without the consent of the investors in the entities that owned the Hotels, the Hotel lenders, and, for the Hotels in bankruptcy, the bankruptcy court.

26. On September 15, 2015, at Singal's urging, and on very short notice, the Hotel Principals travelled from Texas to FC REIT's New York offices; but they left that evening without signing any documents or assigning their interests in the Hotels to Singal's private company.

27. On September 15, 2015, Singal, acting through FC Private, nonetheless purported to contribute the Hotels to FC REIT on that same day by executing several "Assignment and Assumption of Membership Interest" agreements that falsely represented that FC Private "own[ed] 100% Percent of the Membership Interests" in the entities that owned the Hotels, and that title to the Hotels was "good and marketable."

28. The assignment agreements, which Singal signed on behalf of FC Private, also falsely represented that the membership interests were "owned entirely by" FC Private and that FC Private had "full power and authority" to execute the assignments.

#### B. The Day After He Purported to Contribute the Hotels to FC REIT, Singal Signed a Side Letter Agreement Detailing Necessary Steps for His Private Company to Actually Acquire the Hotels

29. Unaware that Singal had executed the assignment agreements and purportedly contributed the Hotels to FC REIT the night before, one of the Hotel Principals wrote to Singal early on the morning of September 16, 2015 about the conditions the Hotel Principals had for assigning rights to the Hotels. He stated that he "heard mention of assignment in one of the phone conversations" the previous night, and that "[i]f [they] are to assign [their] rights as managers *subject to consents of all parties*, [they would not do] that as long as [any of them were] liable on any underlying debt." (emphasis added.)

30. Later on the morning of September 16, 2015, one of the Hotel Principals wrote to Singal and others stating that they needed "a reasonable time to review and comment on documents" and that "[o]bviously it's subject to lender, bankruptcy and shareholder consent...." The Hotel Principal added that obtaining the consents of certain lenders and the bankruptcy courts might be "challenging" and that they had "to convince them in First Capital's ability and commitment to execute...." Singal did not tell the Hotel Principals that he had already executed the assignment agreements.

31. The Hotel Principals returned to FC REIT's offices, located in this District, mid-morning on September 16, 2015, and entered into a side letter agreement (the "Side Letter Agreement") "to memorialize the understanding of the parties...." Singal and one of the Hotel Principals signed the Side Letter Agreement, thereby binding both parties.

32. The Side Letter Agreement detailed the necessary steps that the parties agreed had to occur in order for Singal, or a Singal-related entity, to buy the Hotels. The steps included that a Singal-related entity had to pay $250,000 on or before September 22, 2015, to an entity affiliated with the Hotel Principals. After this happened, the Hotel Principals would use their "diligent, best efforts to obtain all necessary or appropriate bankruptcy court approvals, lender approvals and investor approvals…as soon as practicable...."

33. The Side Letter Agreement further provided that, subject to the bankruptcy court, lenders, and investors approving the transaction, the Hotel Principals and a Singal-related entity "shall enter into a definitive purchase and sale agreement for the acquisition of the [Hotels]...." with a purchase price of $85,650,000, proof of funds for an earnest money deposit of $750,000, and an agreement to indemnify the Hotel Principals for any deficiency on the Hotel loans.

34. After they signed the Side Letter Agreement, the Hotel Principals also signed agreements purporting to assign their interests in the Hotels on September 16, 2015, to FC Private. All the parties knew or were reckless in not knowing that the assignments would not have any effect until Singal first satisfied the conditions in the Side Letter Agreement.

35. Unbeknownst to the Hotel Principals, who had already left FC REIT's New York offices, the assignments of the Hotels from the Hotel Principals to FC Private were later notarized, and the notarization was backdated by one day without their permission or knowledge.

36. Singal did not tell the Hotel Principals that he, acting through FC Private, had already purported to have assigned interests in the Hotels to FC REIT on September 15, 2015.

37. The Hotel Principals later sent multiple email messages to Singal reflecting their understanding they had entered into an agreement to sell the Hotels to FC Private once the conditions in the Side Letter Agreement were met, and that no sale had yet occurred. Singal's emails to the Hotel Principals also reflected his understanding that the negotiations to buy the Hotels were ongoing. Despite his continued assurances that he would do so, Singal never met the conditions in the Side Letter Agreement.

### C. Singal and FC REIT Made Material Misrepresentations and Omissions in FC REIT's Form 8-K Filed on September 21, 2015, and the Amended Form 8-K Filed on September 24, 2015

38. A public REIT is required to file a Form 8-K when an important transaction or certain other types of significant events occur.

39. In a Form 8-K filed on September 21, 2015, FC REIT and Singal knowingly or recklessly, and negligently, misrepresented to shareholders that FC REIT—through its operating partnership—owned, in whole or in part, the Hotels and had assumed the associated debt of the Hotels. The Form 8-K included false statements that: (1) Singal and his related entities had contributed assets with an overall net equity value of $41,777,402—a figure which included the net equity from the Hotels—in exchange for the issuance of 3,344,868 units of FC REIT's operating partnership at a price of $12.49 per OP Unit; and (2) that Singal and his related entities had contributed "18 hotels" representing "$24,095,024 in net equity."

40. Among the list of assets that had supposedly been transferred, FC REIT specifically identified the Hotels by their addresses; and the Form 8-K falsely represented in various charts that FC REIT's operating partnership owned interests in the Hotels by virtue of Singal's FC Private contribution which purportedly ranged from 65 percent to 100 percent.

41. FC REIT also falsely represented that FC REIT's operating partnership owned a 65 percent interest in the entities that owned certain of the Hotels and that FC REIT "thereby control[ed] [the entities]...."

42. Singal signed the filing as the CEO and chairman of the board of directors of FC REIT, even though he knew, or was reckless in not knowing, and should have known, that: (1) several conditions precedent for FC Private to acquire the hotels—let alone for FC Private to have successfully assigned them to FC REIT—remained outstanding; and (2) Singal was still negotiating with the Hotel Principals to acquire the properties.

43. On September 22, 2015, having reviewed FC REIT's Form 8-K, one of the Hotel Principals emailed Singal to express concern that FC REIT listed the Hotels as being owned by FC REIT in a public filing, before the steps in the Side Letter Agreement had been completed, including that "it would be terribly bad for us" if one of the lenders for the Hotels learned of the filing. The Hotel Principals further noted that "we remain very concerned" in the absence of Singal performing the Side Letter Agreement conditions. Singal responded, indicating that he would soon send an indemnification agreement and affirming that he was working on funding the required deposits.

44. On the morning of September 24, 2015, one of the Hotel Principals wrote to Singal that they could not "wait until tomorrow to have a conference call with counsel[.] They have now reviewed the 8k and in their opinion, it needs to be rescinded. It refers to … debt being assumed. It states other things that simply aren't factual. This is a bad situation we now find ourselves in...."

45. Also on September 24, 2015, FC REIT filed an amended Form 8-K that repeated the same the material misrepresentations from the September 21, 2015 Form 8-K relating to FC REIT's ownership of the hotels and assumption of debt, as alleged above. Singal signed the amended Form 8-K as CEO and chairman of the board of FC REIT even though he knew or was reckless in not knowing, and should have known: (1) that several conditions precedent for FC Private to acquire the Hotels, which he had agreed to in the Side Letter Agreement, had not been satisfied; (2) that he had been engaged in continued negotiations with the Hotel Principals to acquire the Hotels; (3) that FC REIT did not control, directly or indirectly, any of the Hotels; and (4) that the Hotel Principals disputed FC REIT's assertion of ownership of the Hotels after reviewing the September 21, 2015 Form 8-K.

46. Singal's and FC REIT's misrepresentations were material because a reasonable investor would have wanted to know the true facts relating to ownership of the Hotels—*i.e.*, that Singal, through FC Private, had not contributed them to FC REIT, and that FC REIT neither owned, nor controlled the Hotels. Singal's misconduct caused FC REIT's net asset value to decline by $15.2 million. Singal's misconduct also caused the net asset value per share to decrease, which resulted in FC REIT selling shares to investors at inflated prices.

### D. Singal Continued His Efforts to Acquire the Hotels

47. Singal did not correct the misrepresentations and omissions in the September 21, 2015 Form 8-K and September 24, 2015 amended Form 8-K, and they remained outstanding for several months while he continued to negotiate with the Hotel Principals to acquire the Hotels. However, Singal still lacked the cash to pay the required deposits, which prevented FC REIT from

acquiring the Hotels. Because he had claimed in two SEC filings that he already owned the Hotels, and had contributed them to FC REIT, Singal was not permitted to use proceeds from FC REIT's offering to pay the deposits and acquire the Hotels.

48. On September 25, 2015, the Hotel Principals wrote to Singal to express their increasingly-urgent concerns about the outstanding Form 8-K filings that falsely represented that FC REIT owned and controlled the Hotels. Moreover, they wanted Singal to immediately send them a "more formal" memorandum of understanding ("MOU"); and they noted that they would "continue to work with [Singal] in [an] attempt to help [him] execute on these deals." They also reiterated that if one of the lenders on the Hotels "gets wind of the 8K filing before we have a chance to notify all parties *we are screwed*." (emphasis added). They added, "WE NEED THAT LETTER (MOU) today."

49. Singal responded that he would "do whatever [he] [could] on [his] end" that day and then later forwarded them a letter on REIT letterhead, which Singal signed on behalf of FC Private. The letter was back-dated to September 16, 2015, and contained the same terms as the Side Letter Agreement.

50. Singal corresponded with the Hotel Principals over the following weeks, expressing that he was trying—and failing—to gain access to cash to make the deposits to begin to satisfy the conditions in the Side Letter Agreement.

51. On October 7, 2015, one of the Hotel Principals wrote Singal, among others, expressing that they were still willing to structure a deal with him. One of the Hotel Principals asked Singal to let them know if he still wanted to buy the Hotels, but he added: "As we discussed and agreed today and last week the current assignments were predicated upon certain conditions precedent that we all know were not met...."

**E. Singal Abandoned His Efforts to Acquire the Hotels for FC REIT in December 2015**

52. By the end of September 2015, the former owner of FC REIT Advisor ("Former Owner"), who had stayed on as a consultant and FC REIT's Chief Investment Officer, had grown concerned about the Hotels, although he was unaware of the Side Letter Agreement and the ongoing negotiations with the Hotel Principals. Additionally, the Former Owner was holding $25 million worth of Singal's OP Units as collateral for the purchase of FC REIT Advisor, the value of which depended in part on the Hotels. He ultimately contacted the Hotels' bankruptcy counsel and demanded that the bankruptcy counsel recognize FC REIT as the owner of the Hotels.

53. After contacting counsel, the Former Owner learned that the Hotel Principals disputed that FC REIT owned the Hotels. The Former Owner concluded that Singal, through FC Private, had been issued $15.2 million in OP Units for the Hotels that FC Private did not own and therefore did not contribute to FC REIT. He demanded that Singal rectify the situation.

54. On October 9, 2015, the Former Owner wrote Singal's attorney, who had represented Singal during the September 15, 2015 transactions, including the contribution of the Hotels, stating:

> We have a problem. I just got off the phone with [bankruptcy counsel]. They are taking the position that 1, there was no consideration for the transfer by [the Hotel Principals] to [FC Private]. 2. [One of the bankruptcy lawyers] tells me that he spoke to Suneet after I sent the letter and Suneet told him that it was all a mistake and that there was no transfer [of] interests and that he should not concern himself with the letter I wrote. 3. That they intend on writing the SEC to state that there was a material misrepresentation made in the 8K with respect to these hotels and that they were not transferred. Not only is this a problem. But $15 million of the OP units are represented by the hotel assets.

55. On October 16, 2015, Singal wrote to the Hotel Principals: "After going through everything with legal counsel back and forth this past couple of weeks, it appears we may need to restructure how the hotel portfolio is put together. We need to satisfy all legal parties and jurisdictions .... The legal complexities introduced this week may steer the ship...."

56. By late-December 2015, Singal abandoned efforts to acquire the Hotels for FC REIT.

57. By reason of Singal's sole ownership and control of FC Private at all relevant times, his knowledge is imputed to FC Private. Thus, FC Private, knowingly or recklessly provided substantial assistance to Singal throughout the fraudulent scheme, including, for example, by purporting to contribute the Hotels using false assignment agreements and accepting the $15.2 million in OP Units.

### F. Singal and FC REIT Made Material Misrepresentations and Omissions in FC REIT's January 7, 2016 and February 8, 2016 Forms 8-K

58. On January 7, 2016, FC REIT filed a Form 8-K, which Singal signed, stating that, on December 31, 2015, FC REIT had notified "[the Hotel Principals] … of its intention not to move forward with the acquisition of twelve limited service properties located in Texas and New Mexico … as a result of [the Hotel Principals'] inability to procure all necessary approvals from … lenders, investors, and the Bankruptcy court for the acquisition" of the properties.

59. The Form 8-K was materially misleading because, among other reasons, it failed to disclose that the actual reason that FC REIT had not acquired the Hotels was that *Singal* failed to make required deposits or to otherwise meet the conditions in the Side Letter Agreement. Singal also knew or was reckless in not knowing, and should have known, that it was materially misleading to describe the Hotels transaction as if it were a *potential* transaction that FC REIT merely decided "not to move forward with" given that Singal previously had represented publicly that FC REIT *already owned* the Hotels in two prior Form 8-K filings, which had not been withdrawn or corrected.

60. Further, FC REIT's description of the properties in the January 7, 2016 Form 8-K was materially different from FC REIT's description of the same properties in the September 2015 Forms 8-K. That made it difficult, if not impossible, for investors reading the January 7, 2016 Form 8-K to understand that the properties described therein were the exact properties that FC REIT represented it owned in the September 2015 Forms 8-K.

61. FC REIT also filed a materially misleading Form 8-K on February 8, 2016, which Singal signed. The February 8, 2016 Form 8-K announced that FC Private had contributed a new property to FC REIT, but failed to disclose that it had contributed that property at a more than 35% discount to try to make up for the fact that FC Private had been issued $15.2 million in OP Units for the Hotels that it neither owned nor contributed to FC REIT.

62. The materially misleading January 7, 2016 and February 8, 2016 Forms 8-K reflected Singal's continued efforts to conceal his fraudulent conduct from FC REIT's investors, and the public with respect to the Hotels. By engaging in his fraudulent scheme, and continuing to lie about it in public documents, Singal deprived current and potential investors of material information about the nature and value of any investment in FC REIT.

63. Given his personal participation in the conduct at issue, as alleged in this Complaint, Singal knew or was reckless in not knowing, and should have known, at the time he signed the January 7, 2016 and February 8, 2016 Forms 8-K that they were materially misleading.

64. Additionally, Singal obtained money or property by means of the material misstatements and omissions in the Forms 8-K described in this Complaint because FC REIT was offering and selling shares at the time and, as the beneficial owner of the REIT Advisor, Singal received asset management fees that were determined in part by reference to the value of FC REIT's total assets.

### G. FC REIT Made Material Misrepresentations and Omissions in Pricing Supplements
### Concerning its Net Asset Value and Sold Shares to Investors at Inflated Prices

65. The NAV, or net asset value, is the total assets of FC REIT minus the liabilities. And the NAV per share is calculated by dividing the NAV by the total number of outstanding shares.

66. FC REIT started calculating NAV in January 2015. Following the initial NAV calculation, FC REIT represented that it would calculate NAV daily and that the price of its shares would be equal to FC REIT's NAV per share plus certain commissions and fees. FC REIT was required to file supplements to its prospectus under the federal securities laws to reflect facts or events that constituted a substantive change or addition to the information set forth in the last prospectus filed with the SEC. FC REIT reported its daily NAV to shareholders through prospectus supplements, which were filed monthly with the SEC and included the NAV per share as of each business day.

67. Singal's failure to contribute the Hotels to FC REIT despite FC REIT having paid for them caused a $15.2 million equity shortfall, which naturally reduced the NAV of FC REIT. Yet, even after this failure, FC REIT filed several monthly pricing supplements to its May 8, 2015 prospectus that materially overstated the NAV per share.

68. FC REIT filed pricing supplements on October 5, 2015, November 2, 2015, December 3, 2015, January 7, 2016 and February 5, 2016. These pricing supplements collectively represented that the NAV per share remained at $12.49 on each day between September 1, 2015 and January 29, 2016. Although no further pricing supplements were filed after February 5, 2016, FC REIT did not report any change in the NAV until July 15, 2016, at which point it reported in a Form 8-K that the NAV per share increased to $16.03 as of July 12, 2016.

69. FC REIT's failure to change the NAV per share to reflect the $15.2 million equity shortfall resulted in FC REIT materially overstating NAV per share between at least September 16, 2015, and February 5, 2016.

70. FC REIT also sold shares at materially overstated prices during this period. On information and belief, FC REIT issued approximately $3.5 million in common stock between September 29, 2015 and February 3, 2016.

71. This conduct was material because a reasonable investor would have wanted to know of the equity shortfall and that the shares were worth less than FC REIT reported. FC REIT knew or was reckless in not knowing, and should have known that the pricing supplements contained materially inflated valuations.

72. FC REIT Advisor, which Singal beneficially owned and controlled at all relevant times, knowingly or recklessly provided substantial assistance to FC REIT in making the material misrepresentations, omissions, and misleading statements in the public filings at issue because it was responsible for assisting FC REIT in preparing, reviewing and filing documents with the Commission. Because he owned and controlled FC REIT Advisor at all relevant times, Singal's knowledge is imputed to it.

73. Further, because Singal was FC REIT's board chairman and CEO, his knowledge is imputed to FC REIT.

### H. FC REIT Failed to File Quarterly and Annual Reports with the SEC

74. Section 15(d) of the Exchange Act, and its Rules 15d-1 and 15d-13 require issuers that have filed a registration statement that has become effective to file periodic reports under conditions that applied to FC REIT. FC REIT was obligated, but failed, to file certain periodic reports, including quarterly reports on Form 10-Q and annual reports on SEC Form 10-K. FC REIT filed a registration statement on Form S-11 that first became effective on August 15, 2012, and it filed several post-effective amendments that subsequently became effective, the last one on May 8, 2015.

75. FC REIT has not filed a quarterly report on Form 10-Q since its quarterly report for the quarter ended June 30, 2015; nor has it filed an annual report on Form 10-K since its annual report for the fiscal year ended December 31, 2014. FC REIT Advisor knowingly or recklessly provided substantial assistance to FC REIT because it was responsible for assisting FC REIT in preparing, reviewing and filing quarterly and annual reports with the Commission.

## II. Fraudulent Conduct Related to the BDC

### A. Starting in 2016, Singal Acquired an Interest in the BDC Advisor, Joined the Investment Committee, and Sought to Have the BDC Invest in Businesses He Owned

76. By fall 2016, Singal's FC Private and its subsidiaries were under significant cash flow pressure.

77. In an effort to raise cash to benefit his other businesses and himself, Singal approached the BDC Advisor about the BDC possibly buying or investing in FC Private and/or some of its subsidiaries. Singal also considered acquiring an interest in the BDC Advisor. By this time, the BDC had not raised any capital from the public; nor had it made any investments.

78. On October 12, 2016, Singal, through FC Private, acquired a 24.9% ownership interest in the parent company that owned the BDC Advisor. In exchange, Singal agreed to provide capital to satisfy certain liabilities of the BDC and the BDC Advisor. The agreement provided that Singal had the option to acquire a controlling interest in the BDC Advisor at a later date, upon the occurrence of certain specified events. Under the deal, the BDC Advisor would "commence due diligence for one or more potential transactions with [FC Private] whereby [FC Private] or an affiliate would sell certain assets to the fund...."

79. In connection with the agreement, Singal also became a member of the BDC Advisor's three person investment committee, which was responsible for evaluating, approving, and managing, the investments of the BDC.

80. On March 28, 2017, Singal, through FC Private, signed an agreement to acquire 100% of the ownership interest in the parent company that owned the BDC Advisor. And on March 30, 2017, Singal became chairman of the BDC's board of directors. That same day, the remainder of the BDC's board of directors resigned and were replaced by board members Singal had chosen. The board also appointed Singal's chosen replacement to be the BDC's president and CEO.

### B. Both the BDC Advisor and Singal Were Investment Advisers and Both Owed a Fiduciary Duty to the BDC

81. Investment advisers are people or companies who, for compensation, are engaged in the business of providing advice to others or issuing reports or analyses regarding securities.

82. Both the BDC Advisor and Singal were investment advisers as defined in the Advisers Act.

83. The BDC Advisor was, for compensation, in the business of advising the BDC as to the value of securities and/or as to the advisability of investing in, purchasing, or selling securities. The written investment advisory agreement between the BDC and the BDC Advisor provided that the BDC Advisor's duties included: (1) determining the composition and allocation of the BDC's portfolio, the nature and timing of the changes therein and the manner of implementing such changes; (2) identifying, evaluating, and negotiating of the structure of the BDC's investments; (3) executing, monitoring, and servicing the BDC's investments; (4) determining the securities and other assets that BDC shall purchase, retain, or sell; (5) performing due diligence on prospective portfolio companies; and (6) providing the BDC with such other investment advisory, research, and related services as the BDC reasonably requested or required for the investment of its funds.

84. The BDC's registration statement provided that the BDC intended to invest in equity and debt securities in addition to originating loans to small- and middle-market U.S. companies.

85. Pursuant to the BDC's investment advisory agreement, the BDC Adviser was entitled to compensation for the investment advisory services it provided. These fees included: (1) a base management fee at an annual rate of 2% of its assets under management, and, (2) an incentive fee that was calculated based on investment income.

86. The BDC paid the BDC Advisor more than $28,000 in base management fees for the fiscal year ended December 31, 2017 for its investment advisory work in identifying, evaluating, negotiating, executing, monitoring, and servicing the BDC's investments.

87. Singal also acted as an investment adviser under the definition in the Advisers Act. Through his membership on the BDC Advisor's investment committee, and as a beneficial owner, he had the power to direct the management and policies of the BDC Advisor.

88. Among other things, Singal personally advised the BDC as to which investments to make, and he had the power to direct the purchase and sale of securities. For example, he recommended that that BDC invest in Company A, and he approved the investments.

89. Singal received compensation for advising the BDC concerning its investments, through his beneficial ownership interest in the BDC Advisor, which received fees, including a base management fee for its advisory services.

90. As investment advisers, both the BDC Advisor and Singal were fiduciaries to the BDC. As such, both the BDC Advisor and Singal owed the BDC affirmative duties of utmost good faith and full and fair disclosure of all material facts. The BDC Advisor and Singal also had an affirmative duty to employ reasonable care to avoid misleading the BDC, and to act in the BDC's best interest.

91. The BDC Advisor and Singal had a duty to eliminate or at least expose through full and fair disclosure all conflicts of interest which might incline them—consciously or unconsciously—to render advice which was not disinterested. Further, Singal and the BDC Advisor had a duty under the investment advisory contract to monitor the BDC's investments and to determine the securities and other assets that the BDC should purchase, retain, or sell.

92. Singal also owed the BDC fiduciary obligations as a director. According to the BDC's offering documents, the BDC's directors had a duty to oversee and monitor the BDC's investment performance. The BDC's directors also had a duty to supervise the BDC Advisor.

**C. Singal Caused the BDC's First Investment to be a Loan to a Company He Owned Until the Day Before the Loan**

93. As the next step in his fraud, Singal convinced the BDC to focus on making a loan to Company A, which Singal owned at the time through FC Private. Company A owned and operated more than a dozen franchised fast food locations on the West Coast. Historically, Singal used the cash Company A generated to support FC Private and his other privately held businesses. At the time of the loan—in significant part because Singal used Company A's cash to benefit FC Private—Company A was behind in paying numerous bills, including rents, sales tax payments, and franchise fees.

94. Because Singal had acquired an interest in the BDC Advisor, the BDC concluded that any investment into entities owned by Singal, such as Company A, would be considered an "affiliated transaction" under Section 57 of the Company Act. BDC management did not want to engage in affiliated transactions, in part because they required approval by the board of directors, which BDC management did not want to seek.

95. Instead, to avoid the issue, BDC management required Singal to sell Company A, as a condition of the loan. BDC management repeatedly told Singal that before the BDC would make the loans to Company A, the BDC's outside legal counsel

had to conclude—among other things—that FC Private's sale of Company A constituted a "true sale," such that the loan would not be considered an affiliated transaction.

96. On February 23, 2017, the day before the BDC entered into its first loan agreement with Company A, Singal sold his interests in Company A to Company A's Manager for $11.5 million through a promissory note for the full amount. It was a seller-financed note, and Singal, acting through FC Private, was the seller.

97. The sale of Company A was documented in a membership interest purchase agreement that provided for an interest rate of six percent, with interest and principal deferred for twelve months after execution of the promissory note. This meant that the Company A Manager had no obligation to pay Singal any principal or interest for twelve months after the parties signed the note.

98. The $11.5 million promissory note from the Company A Manager to FC Private was not executed until several months after the sale. The promissory note was guaranteed by Company A, and it was secured by Company A's membership interests and all the assets of Company A.

99. BDC management required that the $11.5 million promissory note be subordinate to the BDC's loan to Company A. This would mean, for example, that in the event of a default by Company A, the BDC would be paid back for its loan before Singal would be paid under the promissory note.

### D. Despite the Sale, Singal Secretly Maintained Control Over the Management and Policies of Company A

100. Although Singal, through FC Private, sold all the membership interests in Company A to the Company A Manager on February 23, 2017, Singal retained control over the management and policies of Company A by virtue of: (1) his relationship with the Company A Manager and (2) his beneficial ownership interest in and control over Company B, the entity that supplied employees, human resources and accounting services to Company A.

101. Before he bought the company from Singal, the Company A Manager had handled the day-to-day operations of all the fast food restaurants in Company A. He had frequent contact with Singal, as the then-owner, was part of Singal's executive management team, and considered Singal to be a friend. Because of this relationship, the Company A Manager was willing to believe Singal's assurances that that the sale would only be temporary and that Singal's business endeavors would provide opportunities to expand the business.

102. Before he sold Company A, Singal arranged for Company B to be the employer entity for the employees of several of his privately held businesses, including Company A, so that human resources and other services could be centrally managed. Singal owned a 50% interest in Company B and controlled it through FC Private, which was the managing member of Company B.

103. Company B employed, among others, the employees who performed services for his other businesses, including the accounting staff, the Controller and executive managers (including the Company A Manager), as well as the individuals who worked at Company A. Company B billed the various privately held businesses for their portion of payroll and benefits expenses, and it charged each a fee for its services. This arrangement continued at least until August of 2017—several months after Singal sold Company A.

104. Consequently, until August 2017, the same Controller who managed Company A's accounting, cash flow, and bookkeeping functions simultaneously managed the accounting, cash flow, and bookkeeping functions for FC Private. The Controller continued to report to Singal as an employee of Company B; continued to inform Singal of Company A's cash constraints—collectively with the other FC Private entities—and continued to take direction from Singal regarding Company A's cash flow. The Company A Manager also remained on the payroll of Company B post-sale, and Singal continued to treat the Company A Manager as a member of FC Private's executive management team.

105. Additionally, after the sale, Singal maintained authority over Company A's bank accounts; and he could freely transfer cash from Company A's bank accounts to FC Private's bank accounts, which continued to be linked for purposes of cash transfers. In fact, only Singal and the Controller—*not* the Company A Manager—had the authority to make intra-bank cash transfers from Company A to FC Private. Company A also remained a guarantor on certain of FC Private's financial obligations.

106. Moreover, although it never came to fruition, Singal assured the Company A Manager in advance of the sale that the BDC would later buy Company A from the Company A Manager. Singal also indicated to the Company A Manager that FC Private might be willing to partner with Company A to acquire additional franchises and/or otherwise help Company A expand in the future.

107. Singal further assured the Company A Manager that Singal's continued use of Company A's resources to support FC Private would be accounted for—or "trued up"—in connection with some future transaction. Based on Singal's false assurances, the Company A Manager did not take steps to separate Company A's operations from FC Private's operations until approximately August 2017.

108. Singal never disclosed his conflicts of interest to the BDC's independent directors—namely, that he continued to control Company A after he sold it, and that he misappropriated and misdirected money, including BDC loan proceeds, from Company A to support his private businesses following the sale.

### E. Singal Caused the BDC to Make a $1.5 Million Loan to Company A on February 24, 2017, and then Misappropriated More than Half the Proceeds

109. On February 24, 2017, the BDC and Company A executed a loan agreement and promissory note for a $1.5 million loan from the BDC to Company A. Singal suggested that the BDC consider Company A as an investment option, recommended the loan terms, and ultimately approved the loan as a member of the BDC Advisor's investment committee.

110. The promissory note constituted a security, as defined under the federal securities laws, because, among other reasons, Company A wanted to fund its business, and the BDC expected that it would receive a rate of return based on the profits Company A generated through the investment.

111. The loan agreement contained affirmative covenants concerning Company A's use of BDC loan proceeds, stating, "Borrower shall use the proceeds of the Loan evidenced by the Note for (a) expenses relating to the construction of new franchise locations…, (b) expenses relating to the remodeling of existing franchise location and the addition of a new franchise and kiosk …, (c) deposit for remodeling of existing franchise locations … and (d) working capital purposes."

112. Company A received the $1.5 million in BDC loan proceeds on February 27, 2017. By the next day, Singal had directed the transfer of at least $800,000 of the $1.5 million from Company A to FC Private—despite that he had sold Company A, and despite the affirmative covenants prohibiting Singal from using the loan proceeds to support his private businesses.

113. Because he had sold Company A, and he was not otherwise authorized to take Company A's money for his own use, Singal's transfer constituted a misappropriation of the BDC's funds.

114. Singal did not disclose these transfers—which were also conflicts of interest—to the BDC's independent directors. Rather, as Singal directed, the Controller improperly recorded the transfers on Company A's books as principal reduction payments on the $11.5 million note.

115. Singal knew or was reckless in not knowing, and should have known, before Company A received the BDC loan proceeds that he would misappropriate money from Company A to FC Private. To that end, the Controller wrote Singal on February 21,

2017, regarding the expected BDC loan proceeds urging "that a minimum of $700k will need to be kept in [Company A] to start construction projects, reimburse [the Company A Manager] for expenses paid out of pocket, rents, and sales tax."

116. Again on February 24, 2017, the day the loan documents were executed, the Controller wrote to Singal concerning the need to keep at least $700,000 of the BDC loan proceeds with Company A in light of "some serious shortfalls", including for, among other things, rents, sales tax and royalties. The Controller also noted that "there is not enough [money] to go around" and that there would be "negative cash balances in a few weeks." The Controller also admonished Singal that they could no longer "keep transferring $ to [FC Private] on a daily basis as we have done in the past" and that there was a need to keep Company A "in good standing for transfer into the BDC." Despite knowing the purpose of the loan, Singal nonetheless directed the Controller to transfer at least $800,000 to FC Private just four days after receiving this email.

### F. Singal Caused the BDC to Make a Second $1.5 Million Loan to Company A on March 31, 2017, and Again Misappropriated Loan Proceeds

117. In furtherance of his plan to transfer BDC funds to his private company, Singal took on a greater role in the BDC. And on March 28, 2017, Singal signed a deal that would give him 100% ownership of the BDC Advisor; the deal closed on April 3, 2017. On March 30, 2017, Singal became chairman of the BDC's board of directors.

118. The next day, on March 31, 2017, the BDC and Company A executed a loan agreement and promissory note for a second $1.5 million unsecured loan to Company A.

119. For the same reasons as the first loan, the promissory note was a security. Additionally, as with the first loan from the BDC to Company A, the second loan agreement contained affirmative covenants requiring that the BDC loan proceeds be used for specific purposes, including for expenses related to the construction of a new location, expenses relating to the remodeling of two existing locations, and working capital. Singal approved the second loan as a member of the BDC Advisor's three-person investment committee.

120. Company A received $1.5 million in loan proceeds from the second BDC loan on March 31, 2017. That same day, Singal —by then the BDC's chairman—directed the transfer of $500,000 from Company A to FC Private. That transfer was recorded on Company A's general ledger as a principal payment on the $11.5 million note payable from the Company A Manager to FC Private.

121. Because Singal no longer owned Company A, and he did not have authorization to take these funds from the Company A Manager, Singal's actions again constituted a misappropriation of the BDC's funds.

122. Singal knew or was reckless in not knowing, and should have known, before Company A received the BDC loan proceeds that he would misappropriate money from Company A to FC Private.

123. Singal did not disclose to the BDC's independent directors that he had caused the transfer of BDC loan proceeds from the second BDC loan from Company A to FC Private. Transferring BDC loan proceeds from Company A—which Singal secretly continued to control—to FC Private for Singal's personal use was a conflict of interest, and it violated the loan agreements. It also constituted a breach of fiduciary duty involving personal misconduct while Singal was serving as a BDC director.

124. As with the first BDC loan, Singal planned in advance to transfer BDC loan proceeds from Company A to FC Private. Singal carried out his plan over repeated requests of the Company A Manager (who now owned Company A) to keep more of the loan proceeds for Company A. For example, on March 3, 2017, the Company A Manager texted the Controller that Company A needed "to get 2 million from [the] BDC instead of 1" and that "1 million need[ed] to go straight to [Company A]."

125. When Company A received the BDC loan proceeds on March 31, 2017, the Company A Manager wrote the Controller to indicate his concern about Singal's diversions of loan proceeds: "Wire is in!!!!… We should take a picture. It will last longer...." The Controller responded: "I'm taking $500k for [FC Private] and transferring [the] rest of payroll...." That same day the Company A Manager (owner) asked the Controller about the cash flow from a particular retail location, and she told him that, although some of the cash had been used for Company A, most of it was diverted to FC Private. The transfers to FC Private took place at Singal's direction.

126. Singal's misappropriation of March 31, 2017 BDC loan proceeds took place while he was a BDC director and was acting as principal for the BDC. Because he controlled Company A and knew that he was going to take some of the loan proceeds, he knowingly borrowed money from the BDC using Company A as a conduit. Additionally, he knowingly effected a transaction in which the BDC was a joint or joint and several participant.

127. In addition to the approximately $1.3 million in BDC loan proceeds, Singal directed the transfer of (or directly transferred) at least $700,000 more (which may have included BDC loan proceeds) in various amounts and on various days from Company A to FC Private, for his personal use and benefit, between the time after he sold Company A and approximately August 2017.

### G. Singal Exercised His Control Over Company A to Fraudulently Obtain Merchant Cash Advances for His Own Benefit

128. Because Singal had misappropriated as much as half of the $3 million in loan proceeds from the BDC—by diverting those funds to his private company—Company A had very little cash by April 2017, and remained delinquent in its financial obligations.

129. After Singal misappropriated $1.3 million of the BDC loan proceeds, Singal found yet another way to capitalize on his secret control of Company A, and to squeeze more cash out of the struggling company. To that end, after Company A exhausted the BDC loan proceeds that Singal did *not* misappropriate and divert to FC Private, Singal entered into at least eight MCAs, or merchant cash advance agreements, in April, May, and June 2017. In these MCAs Singal sold Company A's receivables, or he used Company A's assets as collateral, for cash advances to FC Private. The receivables he sold totaled more than $1.8 million.

130. These MCAs included sworn Affidavits of Confession of Judgment ("COJ") in which Singal falsely asserted that he owned Company A, which he had already sold. The COJs were either signed by Singal or stamped with his signature stamp and notarized, with his knowledge and approval. Singal hand signed his assistant's notary journal for the COJs at issue.

131. In at least some instances, Company A transferred cash to FC Private the same day that it received the cash advance and recorded the transfers as principal reduction payments on the $11.5 million promissory note.

132. In other instances, the advances went directly to FC Private, but Company A made daily payments and recorded them as principal reduction payments on the $11.5 million promissory note.

133. From April through June 2017, Singal was copied on numerous emails containing drafts of the merchant cash advance applications that falsely listed him as the beneficial owner of Company A post-sale. And Singal communicated with the Controller and others in setting up calls regarding the MCAs. Singal also personally communicated with the lenders' representatives concerning the advances involving Company A post-sale.

134. Singal did not disclose these merchant cash advances to the BDC's independent directors, thereby breaching his duty to act in the BDC's best interest, and to monitor and provide advice about the BDC's investments as required by the advisory contract.

**H. Singal Knew, But Did Not Disclose, That Company A Had Dire Cash Flow**
**Problems that Resulted in Company A Filing for Bankruptcy Protection**

135. The BDC Advisor, which Singal wholly beneficially owned and controlled as of April 3, 2017, had a fiduciary obligation under the terms of the investment advisory agreement to monitor the BDC's investments. For example, the BDC's registration statement placed on the BDC Advisor responsibility for "ongoing monitoring of each investment made, with particular emphasis on early detection of deteriorating credit conditions at portfolio companies which would result in adverse portfolio developments."

136. Singal knew or was reckless in not knowing, and should have known, that Company A had a serious cash flow problem, which he caused or exacerbated by diverting cash to FC Private and by fraudulently incurring the debt obligations under the merchant cash advance agreements. In fact, Singal also knew that the cash problem was so grave that it: (1) jeopardized Company A's ability to continue as a going concern and, (2) put the BDC's unsecured loans to Company A at risk.

137. Singal received numerous emails from the Controller and the Company A Manager concerning Company A's liquidity issues. For example:
a. On April 26, 2017, the Controller informed Singal that Company A was not "generating enough cash to cover all the loan payments." On May 1, 2017, the Controller informed Singal that the state taxing authority had rejected Company A's payment plan regarding more than $167,000 in past due taxes and had put a lien on Company A's bank accounts.

b. On May 17, 2017, the Controller emailed Signal to inform him of "urgent" cash needs including Company A's rent payments, royalty payments, renovation payments and sales tax obligations. The Controller informed Singal that Company A's daily deposits were going to "pay for food and merchant loans. Nothing remaining." The Controller added that there were "no definite sources of cash" and that "[b]ecause [their] cash balances [were] so low and there [were] so many daily payments, [MCA] lenders change or deny at the last minute when they do the bank review. This used to not happen, but it has been happening the last couple of weeks." Singal responded, in part, "There has to be a way to get this figured out" and that they were "too close to succeed vs. fail now."

c. On July 7, 2017, the Company A Manager texted Singal not to "swipe" any additional money from Company A's bank accounts and that he needed to have his credit card bill paid "so the stores can run." The Company A Manager also told Singal that he was "proposing no transfers from [Company A's bank] account[s] without plan[n]ing and [the Company A Manager's] approval." Singal's response made clear he would continue to divert money from Company A, stating, "swipes can't stop ...."

d. On July 10, 2017, Singal personally transferred cash from Company A to FC Private, which cancelled Company A's payroll transfer and left Company A without enough funds to make payroll. The Controller emailed Singal that he had taken "the payroll $ again" that morning and that she "had a wire scheduled to go out" but after his transfer there were not enough funds. The Controller added that they had "over $75k in floating payroll checks from [the prior] week" and that one of the merchant cash advance companies expected "$8k [that day] or they [were] going to collections...." Singal apologized and told her to "move the [Company A] piece back over" but the Controller responded that she could not move it back because there were not enough funds.

e. On July 11, 2017, the Company A Manager texted Singal that a landlord was filing for eviction at two of Company A's business locations. Singal responded that he was "[d]oing everything possible to move cash as fast as" he could. On July 12, 2017, the Company A Manager texted Singal to ask him for a "cash infusion" to buy food because "the well [was] dry" and Company A was "at negative in the accounts." Singal responded that he was not then in a position to help.

138. By July 21, 2017, Company A's financial condition had become so dire that Singal and the Company A Manager began discussing whether Company A should enter bankruptcy.

139. On July 21, 2017, Singal forwarded a bankruptcy lawyer contact to the Company A Manager. On July 24, 2017, the Company A Manager texted the Controller that they were "getting deeper in crap" and that they "may have to file BK for [Company A]."

140. Then on August 1, 2017, a merchant cash advance company froze Company A's bank accounts. By August 2, 2017, Company A had been in default for 60 days on a secured bank loan.

141. On August 22, 2017, Singal texted the Company A Manager to confirm that he was just preparing, but not filing, bankruptcy paperwork. On September 11, 2017, the Controller texted Singal that the Company A Manager was "pretty adamant" about filing for bankruptcy that week. The Controller informed Singal that if he thought he could get funding by the following week then Company A could probably make it, but it if funding was two weeks away then they could not make it. Singal responded: "Yes we are going to make it. Hold strong."

142. On September 13, 2017, the Controller texted the Company A Manager to inform him that Singal had talked to two of the landlords and that they were "willing to wait another couple weeks because they [did not] want BK [bankruptcy]." On September 14, 2017, Singal texted the Company A Manager to ask if he made "an official decision" about bankruptcy and the Company A Manager responded that they "ha[d] to file" because they could not "use any account."

143. Ultimately, Company A filed for bankruptcy protection on September 14, 2017.

144. Despite knowing of Company A's worsening financial state, Singal never disclosed to the BDC that one of its main investments was teetering on the edge of bankruptcy.

145. In August 2019, after Singal was no longer an officer or otherwise affiliated with the BDC, the BDC—under new management—disclosed in its Form 10-K for the fiscal year ended December 31, 2017, that it wrote down the BDC's $3 million investment in Company A to $0 "due to lack of creditworthiness."

146. FC Private, which Singal owned and controlled at all relevant times, knowingly or recklessly provided substantial assistance to Singal throughout the fraudulent scheme, including, for example, by selling Company A, so that the BDC would make loans to Company A, but then accepting the transfer of BDC loan proceeds, which violated the affirmative covenants in Company A's loan agreements with the BDC. Because Singal owned and controlled FC Private, his knowledge is imputed to it.

### I. Singal Continued his Fraudulent Scheme Through the Fall of 2017 by Concealing his Knowledge of Company A's Bankruptcy and his Knowledge of Company A's Use of BDC Loan Proceeds

147. Singal continued his fraudulent scheme by concealing Company A's dire financial condition and bankruptcy plans from BDC management, its independent directors, and its shareholders.

148. For example, following Company A's bankruptcy, Singal signed a Form 8-K filing on September 21, 2017, as acting CEO of the BDC, falsely representing that the BDC had no advance notice of Company A's bankruptcy filing, and that the BDC believed that the bankruptcy filing would not impact the BDC's ability to sell its loan in Company A to a third party.

149. Contrary to the representations in the Forms 8-K, Singal knew or was reckless in not knowing, and should have known in advance, that Company A was in dire financial condition and was preparing to file for bankruptcy protection. He knew this because his fraudulent misconduct was at the very least a major contributing factor in driving Company A into bankruptcy. For the same reasons, he also knew that the BDC was highly unlikely to recover its $3 million investment given Company A's dire financial condition and debt load.

150. Singal also concealed his knowledge that BDC loan proceeds had been transferred to FC Private, ostensibly as principal reduction payments on the $11.5 million note. For example, Signal signed a Company A investment review memorandum dated May 15, 2017, as a member of the BDC Advisor's investment committee, that falsely stated that Company A used the BDC loan proceeds "primarily to upgrade two existing units and to bring on two new sites and to provide working capital" even though he knew that at least $1.3 million of the $3 million total had been transferred to FC Private to be used for the benefit of other entities.

151. Signal later misrepresented his knowledge of Company A's use of BDC loan proceeds in response to requests by the BDC's new auditors. In February of 2018, in response to a request from the BDC's auditors as to whether any of the $3 million in BDC loan proceeds was used to repay the $11.5 million note or otherwise went to any First Capital-related entities, BDC management responded (based on Singal's misrepresentations and omissions) that it did "not believe that any of the 3MM was used to pay the note but [they had] no way to verify that."

152. The BDC's auditor then suggested that BDC management ask Singal and FC Private to confirm that "nobody affiliated with FC received any of the $3MM." Singal falsely stated in response, among other things, that he was "not aware of how the use of proceeds were spent by [Company A] as the business was sold from [FC Private] and [FC Private] simply held a note for $11.5MM which it still [held]...."

153. In contrast to his representations, Singal knew that BDC loan proceeds in fact had been transferred from Company A to FC Private—because he directed the transfers.

### J. Singal Made Material Misrepresentations and Omissions in the BDC's Registration Statement

154. Unless an exemption applies under the federal securities laws, companies such as the BDC seeking to offer securities to the public must file a registration statement with the SEC and must make the disclosures required by the applicable form (in this case SEC Form N-2). Registration statements typically include a prospectus, which makes required disclosures to investors concerning, among other things, the company and the offering to assist them in deciding whether to invest. Under the federal securities laws, companies must update registration statements that have gone effective under certain circumstances through post-effective amendments.

155. Singal made material misrepresentations and omissions in two post-effective amendments to the BDC's registration statement on SEC Form N-2 concerning the relationship between the BDC and Company A, the BDC's only portfolio company at that time. Singal signed the post-effective amendments as chairman of the BDC's board of directors. Form N-2, Item 8, requires BDCs to "disclose … the relationship of the portfolio companies to the Registrant." The instructions for Form N-2 state that "[i]n describing the relationship of portfolio companies to the Registrant," the BDC must "[d]isclose any other material business, professional, or family relationship between the officers and directors of the Registrant and any portfolio company, its officers, directors, and affiliates ...."

156. Singal knowingly or recklessly, and negligently, failed to disclose in Post-Effective Amendments No. 4 and No. 5 to the BDC's registration statement on Form N-2, which were filed on April 11, 2017, and April 28, 2017, respectively, that he—the BDC's chairman of the board of directors—had a material relationship with Company A, the BDC's then only portfolio company, and that he used Company A's resources to support FC Private for his own benefit. Among other things, as of the time of the post-effective amendments at issue, Singal maintained a controlling influence over the management and policies of Company A, and he participated in key decision-making for Company A, even after he divested his interest.

157. Singal also had direct access to Company A's bank accounts, directed the transfer of at least $1.3 million of the $3 million in BDC loan proceeds from Company A to FC Private, and continued to use Company A's cash for his own company, FC Private. Further, Singal, through FC Private, owned a 50% interest in and he controlled the entity that supplied all of the employees for Company A for a fee, at least until August 2017.

158. Additionally, Singal had applied for merchant cash advances on Company A's receivables, falsely representing to own it in sworn affidavits.

159. Therefore, Singal knew or was reckless in not knowing, and should have known, when he signed the post-effective amendments that he—the BDC's chairman of the board—had a material relationship with Company A—the BDC's then only portfolio company. None of this information was disclosed as required by Form N-2.

160. The post-effective amendments also were materially misleading because they represented that the BDC had no relationship with Company A other than in connection with its investments, when in fact Singal, BDC's chairman of the board of directors, was diverting resources from Company A to support FC Private, the entity through which he owned the BDC Advisor.

161. These omissions and misleading statements were material because a reasonable investor would want to know that the BDC's chairman (who also owned and controlled the BDC's investment adviser) had a material relationship with the company in which the BDC made its largest investment and that he exploited that relationship to enrich himself to the detriment of the BDC.

162. Singal obtained money or property by means of these material untrue statements and omissions because the BDC was offering and selling securities to the public at the time, and Singal received asset management fees as the beneficial owner of the BDC Advisor, which were determined in part based on the BDC's gross assets.

### K. Singal Breached his Fiduciary Duty as an Investment Adviser to the BDC, or, in the Alternative, Aided and Abetted the BDC Advisor's Breach of Fiduciary Duty

163. Singal breached his fiduciary duty as an investment adviser to his client, the BDC, in numerous ways. For example, Singal failed to make full and fair disclosure of his conflicts of interest to the BDC's independent directors.

164. Independent directors play a central role policing conflicts of interest and protecting the interests of investment companies subject to the Company Act, such as BDCs, and their investors. The Company Act requires a majority of a BDC's directors to be independent directors, meaning that they are not interested persons of the BDC (*e.g.*, affiliated persons of the BDC or the BDC's investment adviser). In order for independent directors to fulfill the watchdog role envisaged for them by Congress, the investment adviser must make full and fair disclosure to the independent directors of all material facts, especially relating to any potential conflicts of interest, so the independent directors can decide whether to consent to such conflicts.

165. Singal failed to disclose to the BDC's independent directors that he directed the transfer of BDC loan proceeds from Company A to FC Private for his own benefit; that he continued to exercise a controlling influence over the management and policies of Company A; and that he continued to use Company A's resources to support his personal business interests.

166. Singal also failed to disclose to the BDC's independent directors that Company A's business operations continued to be intertwined with those of FC Private and that he had a 50% beneficial ownership interest in Company B, which supplied Company A's employees and provided, *inter alia*, payroll services for a fee.

167. Singal also breached his fiduciary duty to the BDC by failing to disclose to the BDC's independent directors Company A's deteriorating financial condition and his role in causing it.

168. As described above, Singal had a duty to monitor the BDC investments under the terms of the investment advisory contract. Singal knew that Company A was materially delinquent in numerous financial obligations, that it had serious cash flow constraints—which he largely caused—and that it was considering filing for bankruptcy.

169. Singal also knew that he personally contributed to Company A's financial problems by misappropriating to FC Private for his benefit the cash that Company A needed to pay its rent, payroll and other financial obligations, and by taking out several

merchant cash advances on the future receivables of Company A. These actions by Singal eventually led to Company A's bank accounts being frozen and Company A being unable to operate its business. Notwithstanding his knowledge of Company A's financial condition and his role in causing it, Singal failed to disclose that information to the BDC's independent directors pursuant to his duty to monitor the BDC's investments.

170. In the alternative, the BDC Advisor, which Singal beneficially owned, in whole or in part, and controlled at all relevant times, also breached its fiduciary duty to the BDC in violation of the Advisers Act as a result of Singal's conduct described herein. Singal knowingly or recklessly provided substantial assistance to the BDC Adviser through the conduct described in this Complaint. Singal's knowledge is imputed to the BDC Advisor by reason of his ownership interest in and control over it.

## COUNT I

### *Violations of Section 17(a) of the Securities Act*

#### **(Singal)**

171. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

172. By engaging in the conduct described above with respect to both FC REIT and the BDC, Defendant Singal, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (a) knowingly or recklessly employed any device, scheme or artifice to defraud; (b) knowingly, recklessly or negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) knowingly, recklessly or negligently engaged in transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon the purchasers and prospective purchasers of such securities.

173. By reason of the foregoing, Defendant Singal violated, and, unless enjoined, is reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1), Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2), and Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT II

### *Violations of Section 17(a)(2) of the Securities Act*

#### **(FC REIT)**

174. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

175. By engaging in the conduct described above with respect to FC REIT, Defendant FC REIT, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce, or by use of the mails, directly or indirectly knowingly, recklessly or negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

176. By reason of the foregoing, Defendant FC REIT violated, and, unless enjoined, is reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

### COUNT III

#### *Violations of Section 10(b) and Rule 10b-5 of the Exchange Act*

#### (Singal)

177. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

178. By engaging in the conduct described above with respect to both FC REIT and the BDC, Defendant Singal directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, in connection with the purchase or sale of any security, knowingly or recklessly: (a) employed any device, scheme or artifice to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person.

179. By reason of the foregoing, Defendant Singal violated, and, unless enjoined, is reasonably likely to continue to violate, Section 10(b), Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a), Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b), and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c).

### COUNT IV

#### *Violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act*

#### (FC REIT)

180. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

181. By engaging in the conduct described above with respect to FC REIT, Defendant FC REIT directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading in connection with the purchase or sale of any security.

182. By reason of the foregoing, Defendant FC REIT violated, and, unless enjoined, is reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

### COUNT V

#### *Violations of Section 206(1) and Section 206(2) of the Advisers Act*

#### (Singal)

183. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

184. By engaging in the conduct described above with respect to the BDC, Defendant Singal acted as an investment adviser to the BDC within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11). For compensation, he engaged in the business of advising the BDC as to the value of securities and as to the advisability of investing in, purchasing, or selling securities.

185. By engaging in the conduct described above with respect to the BDC, Singal by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, knowingly or recklessly employed any device, scheme, or artifice to defraud any client or prospective client.

186. By engaging in the conduct described above with respect to the BDC, Singal, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, knowingly, recklessly or negligently engaged in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

187. By reason of the foregoing, Singal violated, and, unless enjoined, is reasonably likely to continue to violate, Section 206(1) of the Advisers Act, 15 U.S.C. § 80b-6(1) and Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2).

### COUNT VI

#### Violations of Section 36(a) of the Company Act

#### (Singal)

188. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

189. By engaging in the conduct described above with respect to the BDC, while serving or acting as a director, Defendant Singal engaged in acts or practices constituting a breach of fiduciary duty involving personal misconduct in respect of a registered investment company for which he, at the time of the misconduct, so served or acted.

190. By reason of the forgoing, Defendant Singal violated, and unless enjoined and restrained will continue to violate, Section 36(a) of the Investment Company Act, 15 U.S.C. § 80a-35(a).

### COUNT VII

#### Violations of Section 57(a)(3) and 57(a)(4) of the Company Act and Company Act Rule 17d-1

#### (Singal)

191. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

192. By engaging in the conduct described above with respect to the BDC, Defendant Singal, while serving as a director of a BDC, acting as principal for the BDC, knowingly borrowed money or other property from such BDC or from any company controlled by such BDC.

193. By engaging in the conduct described above as to the BDC, Defendant Singal, while serving as a director of a BDC, acting as principal for the BDC, knowingly effected a transaction in which such BDC or a company controlled by such BDC was a joint or a joint and several participant with him.

194. By engaging in the conduct described above as to the BDC, Defendant Singal, while an affiliated person of the BDC, acting as principal, participated in, or effected a transaction in connection with, any joint enterprise or other joint arrangement or profit-sharing plan in which the BDC was a participant. "Joint enterprise or other joint arrangement or profit sharing plan" is defined in Company Act Rule 17d-1, which applies to Section 57(a)(4) pursuant to Section 57(i), to include any written or oral plan, contract, authorization or arrangement, or any practice or understanding concerning an enterprise or undertaking whereby a registered investment company and any affiliated person have a joint or joint and several participation, or share in the profits of such enterprise or undertaking.

195. By reason of the forgoing, Defendant Singal violated, and unless enjoined and restrained will continue to violate, Section 57(a)(3) of the Investment Company Act , 15 U.S.C. § 80a-56(a)(3), Section 57(a)(4) of the Investment Company Act, 15 U.S.C. § 80a-56(a)(4), and Company Act Rule 17d-1, 17 C.F.R. § 270.17d-1.

### COUNT VIII

### *Violations of Section 15(d) of the Exchange Act and Exchange Act Rules 15d-1 and 15d-13*

### (FC REIT)

196. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

197. By engaging the conduct described above with respect to FC REIT, Defendant FC REIT, having filed a registration statement that had become effective pursuant to the Securities Act of 1933, failed to file quarterly and annual reports on Forms 10-Q and Forms10-K, respectively, within the time period prescribed in the forms.

198. By reason of the forgoing, Defendant FC REIT violated, and unless enjoined and restrained will continue to violate, Section 15(d) of the Exchange Act, 15 U.S.C. § 78(o)(d), and Exchange Rule 15d-1, 17 C.F.R. § 240.15d-1, and Rule 15d-13, 17 C.F.R. § 240.15d-13.

### COUNT IX

### *Aiding and Abetting Violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act*

### (FC REIT Advisor)

199. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

200. By engaging in the conduct described above with respect to FC REIT, Defendant FC REIT Advisor, which was owned and controlled by Signal at all relevant times and was responsible for assisting in the preparing of FC REIT's public filings, knowingly or recklessly provided substantial assistance to FC REIT in its violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

201. By reason of the foregoing, Defendant FC REIT Advisor aided and abetted FC REIT's violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b), as alleged in Count IV, and unless enjoined, will continue to aid and abet violations thereof.

## COUNT X

### Aiding and Abetting Violations of Section 10(b) and Rule 10b-5(a) and (c) of the Exchange Act

### (FC Private)

202. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

203. By engaging in the conduct described above with respect to both FC REIT and the BDC, Defendant FC Private, which was owned and controlled by Singal at all relevant times, knowingly or recklessly provided substantial assistance to Singal in his violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rules 10b-5(a) and 10b-5(c), 17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c).

204. By reason of the foregoing, Defendant FC Private aided and abetted Defendant Singal's violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rules 10b-5(a) and 10b-5(c), 17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c), as alleged in Count III, and unless enjoined, will continue to aid and abet violations thereof.

## COUNT XI

### Aiding and Abetting Violations of Section 17(a)(2) of the Securities Act

### (FC REIT Advisor)

205. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

206. By engaging in the conduct described above with respect to FC REIT, Defendant FC REIT Advisor, which was owned and controlled by Singal at all relevant times and was responsible for assisting in the preparing of FC REIT's public filings, knowingly or recklessly provided substantial assistance to FC REIT in tis violations of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

207. By reason of the foregoing, Defendant FC REIT Advisor aided and abetted FC REIT's violation of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2), as alleged in Count II, and unless enjoined, will continue to aid and abet violations thereof.

## COUNT XII

### Aiding and Abetting Violations of Section 17(a)(1) and 17(a)(3) of the Securities Act

### (FC Private)

208. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

209. By engaging in the conduct described above with respect to both the REIT and the BDC, Defendant FC Private, which was owned and controlled by Singal at all relevant times, knowingly or recklessly provided substantial assistance to Defendant Singal in his violations of Section 17(a)(1) and Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(1) and (a)(3).

210. By reason of the foregoing, Defendant FC Private aided and abetted Defendant Singal's violation of Section 17(a)(1) and Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(1) and (a)(3), as alleged in Count I, and unless enjoined, will continue to aid and abet violations thereof.

## COUNT XIII

### Aiding and Abetting Violations of Sections 206(1) and (2) of the Advisers Act

### (Singal)

211. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

212. By engaging in the conduct described above with respect to the BDC, Defendant Singal knowingly or recklessly provided substantial assistance to the BDC Advisor, which was owned in whole or in part and controlled by Singal at all relevant times, in its violations of Sections 206(1) and (2) of the Advisers Act.

213. By reason of the foregoing, Defendant Singal aided and abetted the BDC Advisor's violation of Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. § 80b-6(1) and 80b-6(2), as alleged in this Complaint, and unless enjoined, will continue to aid and abet violations thereof.

## COUNT XIV

### Aiding and Abetting Violations of Section 15(d) of the Exchange Act and Exchange Act Rules 15d-1 and 15d-13

### (FC REIT Advisor)

214. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

215. By engaging in the conduct described above with respect to FC REIT, Defendant FC REIT Advisor which was owned and controlled by Singal at all relevant times and was responsible for assisting in the preparing of FC REIT's public filings, knowingly or recklessly provided substantial assistance to FC REIT in its violations of Section 15(d) of the Exchange Act and Exchange Act Rules 15d-1 and 15d-1.

216. By reason of the foregoing, Defendant FC REIT Advisor aided and abetted FC REIT's violation of Section 15(d) of the Exchange Act, 15 U.S.C. § 78(o)(d), and Exchange Rule 15d-1, 17 C.F.R. § 240.15d-1, and Rule 15d-13, 17 C.F.R. § 240.15d-13, as alleged in Count VIII, and unless enjoined, will continue to aid and abet violations thereof.

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find Defendants committed the violations charged, and enter Judgments:

## I.

### Permanent Injunctions

Permanently restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating the federal securities laws alleged in this Complaint.

## II.

### *Disgorgement*

Ordering Defendants Singal and FC Private to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

## III.

### *Penalties*

Ordering Defendants Singal, FC Private, and FC REIT Advisor to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), and as to Singal, further pursuant to Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e).

## IV.

### *Officer and Director Bar*

Ordering pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), Section 21(d)(2) of the Exchange Act, 15 U.S.C § 78u(d)(2), and Section 21(d)(5) of the Exchange Act, 15 U.S.C. § 78u(d)(5), and in the inherent equitable powers of this Court, permanently prohibiting Defendant Singal from acting as an officer or director of any issuer whose securities are registered with the Commission pursuant to Section 12 of the Exchange Act or which is required to file reports with the Commission pursuant to section 15(d) of the Exchange Act.

## V.

### *Further Relief*

Granting such other and further relief as the Court determines to be necessary and appropriate.

## VI.

### *Retention of Jurisdiction*

Further, the Commission respectfully requests the Court retain jurisdiction over this action and over Defendants in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

### *DEMAND FOR A JURY TRIAL*

Under Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury in this action of all issues so triable.

DATED: December 13, 2019

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

By: */s/*

Derek S. Bentsen (DB-8369)

Joshua E. Braunstein (*pro hac* to be filed)

Matthew F. Scarlato (*pro hac* to be filed)

Securities and Exchange Commission

100 F Street, NE

Washington, DC 20549

Telephone: (202) 551-6426 (Bentsen)

Email: BentsenD@sec.gov

*Attorneys for Plaintiff*

---

**End of Document**                                                  © 2021 Thomson Reuters. No claim to original U.S. Government Works.